# UPHAUS *v.* WYMAN, ATTORNEY GENERAL OF NEW HAMPSHIRE.

No. 34.   Argued November 17–18, 1958.—Decided June 8, 1959.

*Royal W. France* and *Leonard B. Boudin* argued the cause for appellant. With them on the brief were *Hugh H. Bownes* and *Victor Rabinowitz.*

*Louis C. Wyman,* Attorney General of New Hampshire, argued the cause for appellee. With him on the brief was *Dort S. Bigg.*

*Nathan Witt* and *John M. Coe* filed a brief for the National Lawyers Guild, as *amicus curiae,* urging reversal.

MR. JUSTICE CLARK delivered the opinion of the Court.

This case is here again on appeal from a judgment of civil contempt entered against appellant by the Merrimack County Court and affirmed by the Supreme Court of New Hampshire. It arises out of appellant's refusal to produce certain documents before a New Hampshire legislative investigating committee which was authorized and directed to determine, *inter alia,* whether there were subversive persons or organizations present in the State of New Hampshire. Upon the first appeal from the New Hampshire court, 100 N. H. 436, 130 A. 2d 278, we vacated the judgment and remanded the case to it, 355 U. S. 16, for consideration in the light of *Sweezy* v. *New Hampshire,* 354 U. S. 234 (1957). That court reaffirmed its former decision, 101 N. H. 139, 136 A. 2d 221, deeming *Sweezy* not to control the issues in the instant case. For

reasons which will appear, we agree with the Supreme Court of New Hampshire.

As in *Sweezy*, the Attorney General of New Hampshire, who had been constituted a one-man legislative investigating committee by Joint Resolution of the Legislature,[1] was conducting a probe of subversive activities in the State. In the course of his investigation the Attorney General called appellant, Executive Director of World Fellowship, Inc., a voluntary corporation organized under the laws of New Hampshire and maintaining a summer camp in the State. Appellant testified concerning his own activities, but refused to comply with two subpoenas *duces tecum* which called for the production of certain corporate records for the years 1954 and 1955. Th. information sought consisted of: (1) a list of the names of all the camp's nonprofessional employees for those two summer seasons; (2) the correspondence which appellant had carried on with and concerning those persons who came to the camp as speakers; and (3) the names of all persons who attended the camp during the same periods of time. Met with appellant's refusal, the Attorney General, in accordance with state procedure, N. H. Rev. Stat. Ann., c. 491, §§ 19, 20, petitioned the Merrimack County Court to call appellant before it and require compliance with the subpoenas.

In court, appellant again refused to produce the information. He claimed that by the Smith Act,[2] as con-

---

[1] *"Resolved by the Senate and House of Representatives in General Court convened:*

"That the attorney general is hereby authorized and directed to make full and complete investigation with respect to violations of the subversive activities act of 1951 and to determine whether subversive persons as defined in said act are presently located within this state. . . ." N. H. Laws, 1953, c. 307.

The investigation authorized by this resolution was continued by N. H. Laws, 1955, c. 197.

[2] 18 U. S. C. § 2385 (1956).

strued by this Court in *Pennsylvania* v. *Nelson,* 350 U. S. 497 (1956), Congress had so completely occupied the field of subversive activities that the States were without power to investigate in that area. Additionally, he contended that the Due Process Clause precluded enforcement of the subpoenas, first, because the resolution under which the Attorney General was authorized to operate was vague and, second, because the documents sought were not relevant to the inquiry. Finally, appellant argued that enforcement would violate his rights of free speech and association.

The Merrimack County Court sustained appellant's objection to the production of the names of the nonprofessional employees. The Attorney General took no appeal from that ruling, and it is not before us. Appellant's objections to the production of the names of the camp's guests were overruled, and he was ordered to produce them. Upon his refusal, he was adjudged in contempt of court and ordered committed to jail until he should have complied with the court order. On the demand for the correspondence and the objection thereto, the trial court made no ruling but transferred the question to the Supreme Court of New Hampshire. That court affirmed the trial court's action in regard to the guest list. Concerning the requested production of the correspondence, the Supreme Court entered no order, but directed that on remand the trial court "may exercise its discretion with respect to the entry of an order to enforce the command of the subpoena for the production of correspondence." 100 N. H., at 448, 130 A. 2d, at 287. No remand having yet been effected, the trial court has not acted upon this phase of the case, and there is no final judgment requiring the appellant to produce the letters. We therefore do not treat with that question. 28 U. S. C. § 1257. See *Radio Station WOW* v. *Johnson,* 326 U. S. 120, 123–124 (1945). We now pass to a consideration of the sole

question before us, namely, the validity of the order of contempt for refusal to produce the list of guests at World Fellowship, Inc., during the summer seasons of 1954 and 1955. In addition to the arguments appellant made to the trial court, he urges here that the "indefinite sentence" imposed upon him constitutes such cruel and unusual punishment as to be a denial of due process.

Appellant vigorously contends that the New Hampshire Subversive Activities Act of 1951 [3] and the resolution creating the committee have been superseded by the Smith Act, as amended.[4] In support of this position appellant cites *Pennsylvania* v. *Nelson, supra.* The argument is that *Nelson,* which involved a prosecution under a state sedition law, held that "Congress has intended to occupy the field of sedition." This rule of decision, it is contended, should embrace legislative investigations made pursuant to an effort by the Legislature to inform itself of the presence of subversives within the State and possibly to enact laws in the subversive field. The appellant's argument sweeps too broad. In *Nelson* itself we said that the "precise holding of the court . . . is that the Smith Act . . . which prohibits the knowing advocacy of the overthrow of the Government of the United States by force and violence, supersedes the enforceability of the Pennsylvania Sedition Act which proscribed the *same conduct.*" (Italics supplied.) 350 U. S., at 499. The basis of *Nelson* thus rejects the notion that it stripped the States of the right to protect themselves. All the opinion proscribed was a race between federal and state prosecutors to the courthouse door. The opinion made clear that a State could proceed with prosecutions for sedition against the State itself; that it can legitimately investigate in this area follows *a fortiori.* In *Sweezy* v. *New Hampshire, supra,* where the same contention was made

---

[3] N. H. Rev. Stat. Ann., 1955, c. 588, §§ 1–16.

[4] Note 2, *supra.*

as to the identical state Act, it was denied *sub silentio.*
Nor did our opinion in *Nelson* hold that the Smith Act
had proscribed state activity in protection of itself either
from actual or threatened "sabotage or attempted violence
of all kinds." In footnote 8 of the opinion it is pointed
out that the State had full power to deal with internal
civil disturbances. Thus registration statutes, *quo war-
ranto* proceedings as to subversive corporations, the sub-
versive instigation of riots and a host of other subjects
directly affecting state security furnish grist for the State's
legislative mill. Moreover, the right of the State to
require the production of corporate papers of a state-
chartered corporation in an inquiry to determine whether
corporate activity is violative of state policy is, of course,
not touched upon in *Nelson* and today stands unimpaired,
either by the Smith Act or the *Nelson* opinion.

Appellant's other objections can be capsuled into the
single question of whether New Hampshire, under the
facts here, is precluded from compelling the production
of the documents by the Due Process Clause of the Four-
teenth Amendment. Let us first clear away some of the
underbrush necessarily surrounding the case because of
its setting.

First, the academic and political freedoms discussed in
*Sweezy* v. *New Hampshire, supra,* are not present here
in the same degree, since World Fellowship is neither a
university nor a political party. Next, since questions
concerning the authority of the committee to act as it
did are questions of state law, *Dreyer* v. *Illinois*, 187 U. S.
71, 84 (1902), we accept as controlling the New Hamp-
shire Supreme Court's conclusion that "[t]he legislative
history makes it clear beyond a reasonable doubt that it
[the Legislature] did and does desire an answer to these
questions." 101 N. H., at 140, 136 A. 2d, at 221–222.
Finally, we assume, without deciding, that Uphaus had
sufficient standing to assert any rights of the guests whose

identity the committee seeks to determine. See *National Association for the Advancement of Colored People* v. *Alabama*, 357 U. S. 449 (1958). The interest of the guests at World Fellowship in their associational privacy having been asserted, we have for decision the federal question of whether the public interests overbalance these conflicting private ones. Whether there was "justification" for the production order turns on the "substantiality" of New Hampshire's interests in obtaining the identity of the guests when weighed against the individual interests which the appellant asserts. *National Association for the Advancement of Colored People* v. *Alabama, supra.*

What was the interest of the State? The Attorney General was commissioned[5] to determine if there were any subversive persons[6] within New Hampshire. The obvious starting point of such an inquiry was to learn what persons were within the State. It is therefore clear that the requests relate directly to the Legislature's area of interest, *i. e.*, the presence of subversives in the State, as announced in its resolution. Nor was the demand of the subpoena burdensome; as to time, only a few months of each of the two years were involved; as to place, only the camp conducted by the Corporation; nor as to the lists of names, which included about 300 each year.

---

[5] Note 1, *supra.*

[6] Section 1 of the Subversive Activities Act, N. H. Rev. Stat. Ann., 1955, c. 588, §§ 1–16, defines "subversive person":

"'Subversive person' means any person who commits, attempts to commit, or aids in the commission, or advocates, abets, advises or teaches, by any means any person to commit, attempt to commit, or aid in the commission of any act intended to overthrow, destroy or alter, or to assist in the overthrow, destruction or alteration of, the constitutional form of the government of the United States, or of the state of New Hampshire, or any political subdivision of either of them, by force, or violence; or who is a member of a subversive organization or a foreign subversive organization."

Moreover, the Attorney General had valid reason to believe that the speakers and guests at World Fellowship might be subversive persons within the meaning of the New Hampshire Act. The Supreme Court of New Hampshire found Uphaus' contrary position "unrelated to reality." Although the evidence as to the nexus between World Fellowship and subversive activities may not be conclusive, we believe it sufficiently relevant to support the Attorney General's action. The New Hampshire definition of subversive persons was born of the legislative determination that the Communist movement posed a serious threat to the security of the State. The record reveals that appellant had participated in "Communist front" activities and that "[n]ot less than nineteen speakers invited by Uphaus to talk at World Fellowship had either been members of the Communist Party or had connections or affiliations with it or with one or more of the organizations cited as subversive or Communist controlled in the United States Attorney General's list." 100 N. H., at 442, 130 A. 2d, at 283. While the Attorney General's list is designed for the limited purpose of determining fitness for federal employment, *Wieman* v. *Updegraff*, 344 U. S. 183 (1952), and guilt by association remains a thoroughly discredited doctrine, it is with a legislative investigation—not a criminal prosecution— that we deal here. Certainly the investigatory power of the State need not be constricted until sufficient evidence of subversion is gathered to justify the institution of criminal proceedings.

The nexus between World Fellowship and subversive activities disclosed by the record furnished adequate justification for the investigation we here review. The Attorney General sought to learn if subversive persons were in the State because of the legislative determination that such persons, statutorily defined with a view toward the Communist Party, posed a serious threat to the security

of the State. The investigation was, therefore, undertaken in the interest of self-preservation, "the ultimate value of any society," *Dennis* v. *United States,* 341 U. S. 494, 509 (1951). This governmental interest outweighs individual rights in an associational privacy which, however real in other circumstances, cf. *National Association for the Advancement of Colored People* v. *Alabama, supra,* were here tenuous at best. The camp was operating as a public one, furnishing both board and lodging to persons applying therefor. As to them, New Hampshire law requires that World Fellowship, Inc., maintain a register, open to inspection of sheriffs and police officers.[7] It is contended that the list might be "circulated throughout the states and the Attorney Generals throughout the states have cross-indexed files, so that any guest whose name is mentioned in that kind of proceeding immediately becomes suspect, even in his own place of residence." Record, p. 7. The record before us, however, only reveals a report to the Legislature of New Hampshire made by the Attorney General in accordance with the requirements of the resolution. We recognize, of course, that compliance with the subpoena will result in exposing the fact that the persons therein named were guests at World Fellowship. But so long as a committee must report to its legislative

---

[7] Since 1927, there has been in effect the following statute in New Hampshire:

"All hotel keepers and all persons keeping public lodging houses, tourist camps, or cabins shall keep a book or card system and cause each guest to sign therein his own legal name or name by which he is commonly known. Said book or card system shall at all times be open to the inspection of the sheriff or his deputies and to any police officer. . . ." N. H. Rev. Stat. Ann., 1955, c. 353, § 3.

The Attorney General represents that the public camp of World Fellowship, Inc., is clearly within the purview of this statute. Although the lists sought were more extensive than those required by the statute, it appears that most of the names were recorded pursuant to it.

parent, exposure—in the sense of disclosure—is an inescapable incident of an investigation into the presence of subversive persons within a State. And the governmental interest in self-preservation is sufficiently compelling to subordinate the interest in associational privacy of persons who, at least to the extent of the guest registration statute, made public at the inception the association they now wish to keep private. In the light of such a record we conclude that the State's interest has not been "pressed, in this instance, to a point where it has come into fatal collision with the overriding" constitutionally protected rights of appellant and those he may represent. *Cantwell* v. *Connecticut,* 310 U. S. 296, 307 (1940).

We now reach the question of the validity of the sentence. The judgment of contempt orders the appellant confined until he produces the documents called for in the subpoenas. He himself admitted to the court that although they were at hand, not only had he failed to bring them with him to court, but that, further, he had no intention of producing them. In view of appellant's unjustified refusal we think the order a proper one. As was said in *Green* v. *United States,* 356 U. S. 165, 197 (1958) (dissenting opinion):

> "Before going any further, perhaps it should be emphasized that we are not at all concerned with the power of courts to impose conditional imprisonment for the purpose of compelling a person to obey a valid order. Such coercion, where the defendant carries the keys to freedom in his willingness to comply with the court's directive, is essentially a civil remedy designed for the benefit of other parties and has quite properly been exercised for centuries to secure compliance with judicial decrees."

We have concluded that the committee's demand for the documents was a legitimate one; it follows that the judgment of contempt for refusal to produce them is valid.

We do not impugn appellant's good faith in the assertion of what he believed to be his rights. But three courts have disagreed with him in interpreting those rights. If appellant chooses to abide by the result of the adjudication and obey the order of New Hampshire's courts, he need not face jail. If, however, he continues to disobey, we find on this record no constitutional objection to the exercise of the traditional remedy of contempt to secure compliance.

*Affirmed.*

MR. JUSTICE BRENNAN, with whom THE CHIEF JUSTICE, MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS join, dissenting.

The Court holds today that the constitutionally protected rights of speech and assembly of appellant and those whom he may represent are to be subordinated to New Hampshire's legislative investigation because, as applied in the demands made on him, the investigation is rationally connected with a discernible legislative purpose. With due respect for my Brothers' views, I do not agree that a showing of any requisite legislative purpose or other state interest that constitutionally can subordinate appellant's rights is to be found in this record. Exposure purely for the sake of exposure is not such a valid subordinating purpose. *Watkins* v. *United States,* 354 U. S. 178, 187, 200; *Sweezy* v. *New Hampshire,* 354 U. S. 234; *NAACP* v. *Alabama,* 357 U. S. 449. This record, I think, not only fails to reveal any interest of the State sufficient to subordinate appellant's constitutionally protected rights, but affirmatively shows that the investigatory objective was the impermissible one of exposure for exposure's sake. I therefore dissent from the judgment of the Court.

I fully appreciate the delicacy of the judicial task of questioning the workings of a legislative investigation.

A proper regard for the primacy of the legislative function in its own field, and for the broad scope of the investigatory power to achieve legislative ends, necessarily should constrain the judiciary to indulge every reasonable intendment in favor of the validity of legislative inquiry. However, our frame of government also imposes another inescapable duty upon the judiciary, that of protecting the constitutional rights of freedom of speech and assembly from improper invasion, whether by the national or the state legislatures. See *Watkins* v. *United States, supra; Sweezy* v. *New Hampshire, supra; NAACP* v. *Alabama, supra.* Where that invasion is as clear as I think this record discloses, the appellant is entitled to our judgment of reversal.

Judicial consideration of the collision of the investigatory function with constitutionally protected rights of speech and assembly is a recent development in our constitutional law. The Court has often examined the validity under the Federal Constitution of federal and state statutes and executive action imposing criminal and other traditional sanctions on conduct alleged to be protected by the guarantees of freedom of speech and of assembly. The role of the state-imposed sanctions of imprisonment, fines and prohibitory injunctions directed against association or speech and their limitations under the First and Fourteenth Amendments has been canvassed quite fully, beginning as early as *Gitlow* v. *New York,* 268 U. S. 652, and *Near* v. *Minnesota,* 283 U. S. 697. And other state action, such as deprivation of public employment and the denial of admission to a profession, has also been recognized as being subject to the restraints of the Constitution. See, *e. g., Wieman* v. *Updegraff,* 344 U. S. 183; cf. *Schware* v. *Board of Bar Examiners,* 353 U. S. 232.

But only recently has the Court been required to begin a full exploration of the impact of the governmental

investigatory function on these freedoms.[1]  Here is intro-
duced the weighty consideration that the power of investi-
gation, whether exercised in aid of the governmental legis-
lative power, see *Watkins* v. *United States, supra,* or in
aid of the governmental power to adjudicate disputes, see
*NAACP* v. *Alabama, supra,* is vital to the functioning of
free governments and is therefore necessarily broad.  But
where the exercise of the investigatory power collides with
constitutionally guaranteed freedoms, that power too has
inevitable limitations, and the delicate and always diffi-
cult accommodation of the two with minimum sacrifice of
either is the hard task of the judiciary and ultimately of
this Court.

It was logical that the adverse effects of unwanted
publicity—of exposure—as concomitants of the exercise
of the investigatory power, should come to be recognized,
in certain circumstances, as invading protected freedoms
and offending constitutional inhibitions upon governmen-
tal actions.  For in an era of mass communications and
mass opinion, and of international tensions and domes-
tic anxiety, exposure and group identification by the
state of those holding unpopular and dissident views
are fraught with such serious consequences for the indi-
vidual as inevitably to inhibit seriously the expression of
views which the Constitution intended to make free.  Cf.
*Speiser* v. *Randall,* 357 U. S. 513, 526.  We gave expres-
sion to this truism in *NAACP* v. *Alabama:* "This Court
has recognized the vital relationship between freedom
to associate and privacy in one's associations. . . .  Invio-
lability of privacy in group association may in many

---

[1] The two leading earlier cases relate generally to the congressional
power to investigate, and were not required to explore it in the con-
texts of freedom of speech and of assembly.  *Kilbourn* v. *Thompson,*
103 U. S. 168; *McGrain* v. *Daugherty,* 273 U. S. 135.  See the
opinion in the latter case, *ibid.,* at 175–176.

circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." 357 U. S., at 462.

Of course, the considerations entering into the weighing of the interests concerned are different where the problem is one of state exposure in the area of assembly and expression from where the problem is that of evaluating a state criminal or regulatory statute in these areas. Government must have freedom to make an appropriate investigation where there appears a rational connection with the lawmaking process, the processes of adjudication, or other essential governmental functions. In the investigatory stage of the legislative process, for example, the specific interest of the State and the final legislative means to be chosen to implement it are almost by definition not precisely defined at the start of the inquiry, and due allowance must accordingly be made. Also, when exposure is evaluated judicially as a governmental sanction, there should be taken into account the differences between it and the more traditional state-inflicted pains and penalties. True it is, therefore, that any line other than a universal subordination of free expression and association to the asserted interests of the State in investigation and exposure will be difficult of definition; but this Court has rightly turned its back on the alternative of universal subordination of protected interests, and we must define rights in this area the best we can. The problem is one in its nature calling for traditional case-by-case development of principles in the various permutations of circumstances where the conflict may appear. But guide lines must be marked out by the courts. "This is the inescapable judicial task in giving substantive content, legally enforced, to the Due Process Clause, and it is a task ultimately committed to this Court." *Sweezy* v. *New Hampshire,* 354 U. S. 234, 267 (concurring opinion). On the facts of this case I think

that New Hampshire's investigation, as applied to the appellant, was demonstrably and clearly outside the wide limits of the power which must be conceded to the State even though it be attended by some exposure. In demonstration of this I turn to the detailed examination of the facts which this case requires.

The appellant, Uphaus, is Executive Director of a group called World Fellowship which runs a discussion program at a summer camp in New Hampshire, at which the public is invited to stay. Various speakers come to the camp primarily for discussion of political, economic and social matters. The appellee reports that Uphaus and some of the speakers have been said by third persons to have a history of association with "Communist front" movements, to have followed the "Communist line," signed amnesty petitions and *amicus curiae* briefs, and carried on similar activities of a sort which have recently been viewed hostilely and suspiciously by many Americans. A strain of pacifism runs through the appellant's thinking, and the appellee apparently would seek to determine whether there should be drawn therefrom an inference of harm for our institutions; he conjectures, officially, whether "the advocacy of this so-called peace crusade is for the purpose of achieving a quicker and a cheaper occupation by the Soviet Union and Communism." There is no evidence that any activity of a sort that violates the law of New Hampshire or could in fact be constitutionally punished went on at the camp. What is clear is that there was some sort of assemblage at the camp that was oriented toward the discussion of political and other public matters. The activities going on were those of private citizens. The views expounded obviously were minority views. But the assemblage was, on its face, for purposes to which the First and Fourteenth Amendments give constitutional protection against incur-

sion by the powers of government. Cf. *Sweezy* v. *New Hampshire, supra*, at 249–251.

The investigation with which this case is concerned was undertaken under authority of a 1953 Resolution of the New Hampshire General Court, N. H. Laws 1953, c. 307, and extended by an enactment in 1955, N. H. Laws, 1955, c. 197. The Resolution directed the Attorney General of the State (appellee here) to make a "full and complete investigation" of "violations of the subversive activities act of 1951" [2] and to determine whether "subversive per-

---

[2] The Act was c. 193 of the Laws of New Hampshire, 1951. After an extensive preamble, § 1 provided various definitions, including definitions of · "subversive organization" and "foreign subversive organization"; the definition of "subversive person," also provided, was: "any person who commits, attempts to commit, or aids in the commission, or advocates, abets, advises or teaches, by any means any person to commit, attempt to commit, or aid in the commission of any act intended to overthrow, destroy or alter, or to assist in the overthrow, destruction ·or alteration ·of, the constitutional form of the government of the United States, or of the state of New Hampshire, or any political subdivision of either of them, by force, or violence; or who is a member of a subversive organization or a foreign subversive organization." For a discussion of the breadth of this definition, see *Sweezy* v. *New Hampshire, supra*, at 246–247.

Section 2 of the Act defines the crime of sedition. The definition is based on the quoted definition of "subversive person," except that the final "membership clause" is omitted and a "clear and present danger" test is introduced in regard to advocacy, abetting, advising and teaching. Assisting in the formation of a subversive organization or foreign subversive organization, managing one, contributing to its support, destroying its papers, or hiding its funds, "knowing said organization to be a subversive organization or a foreign subversive organization" also constitutes the offense, which is punishable by twenty years' imprisonment or a fine of $20,000, or both. Those who become or remain ·members of a subversive organization or a foreign· subversive organization, after certain dates, "knowing said organization to be a subversive organization or a foreign subversive organization," under § 3, are liable to five years' imprisonment or a $5,000 fine, or both. Section 4 disqualifies those convicted under

sons as defined in said act are presently located within the
state." Under New Hampshire law, this constituted the
Attorney General (who is ordinarily the chief law-enforce-
ment official of the State) a one-man legislative commit-
tee. The sanctions of prosecution of individuals and dis-
solution of organizations for violation of the 1951 law seem
to have been discarded, with the passage of the Resolu-
tion, in favor of the sanction of exposure. A provision of
the 1951 Act providing for confidential treatment of mate-
rial reflecting on individuals' loyalty was made inappli-
cable to the investigation the Attorney General was
directed to conduct, and the Attorney General was author-
ized in sweeping terms to give publicity to the details of
his investigation. A report to the Legislature of the fruits
of the investigation was to be made on the first day of the
1955 legislative session; the 1955 extension called for a
similar report to the 1957 session.[3] Efforts to obtain
from the appellant the disclosures relative to World Fel-
lowship in controversy here began during the period
covered by the 1953 Resolution, but his final refusal and
the proceeding for contempt under review here occurred
during the extension.

The fruits of the first two years of the investigation
were delivered to the Legislature in a comprehensive vol-
ume on January 5, 1955. The Attorney General urges
this report on our consideration as extremely relevant to
a consideration of the investigation as it relates to appel-
lant. I think that this is quite the case; the report is an
official indication of the nature of the investigation and
is, in fact, the stated objective of the duty assigned by
the Resolution to the Attorney General. It was with this

§ 2 or § 3 from public office or employment, and § 9 erects a similar
disqualification in the case of all "subversive persons." Section 5
provides for the dissolution of subversive organizations and foreign
subversive organizations functioning in New Hampshire.

[3] None appears to have been made.

report before it that the Legislature renewed the investigation, and it must be taken as characterizing the nature of the investigation before us. The report proper is divided into numerous sections. First is a series of general and introductory essays by various authors entitled "Pertinent Aspects of World Communism Today." Essays discuss "The Nature of the Russian Threat"; "The Role of the Communist Front Organizations"; "Some Important Aspects of Marxism and Marxism-Leninism"; "The Test of a Front Organization"; and "Communism vs. Religion." General descriptive matter on the Communist Party in New Hampshire follows. It hardly needs to be said that this introductory material would focus attention on the whole report in terms of "Communism" regardless of what was said about the individuals later named. Next comes a general section titled "Communist Influence in a Field of Education" which is replete with names and biographical material of individuals; a similar section on "Communist Influence in the Field of Labor"; and one more generically captioned "Organizations," in which various details as to the appellant, his organization, and others associated in it are presented. Last comes a section entitled "Individuals" in which biographical sketches of 23 persons are presented.

The introductory matter in the volume, to put the matter mildly, showed consciousness of the practical effect of the change of policy from judicial prosecution to exposure by the Attorney General of persons reported to be connected with groups charged to be "subversive" or "substantially Communist-influenced." Virtually the entire "Letter of Transmittal" of the Attorney General addressed itself to discussing the policy used in the report in disclosing the names of individuals. The Attorney General drew a significant distinction as to the names he would disclose: "Persons with past membership or affiliation with the Communist Party or substantially

Communist-influenced groups have not been disclosed in this report where those persons have provided assistance to the investigation. It is felt that no good reasons exist requiring a listing of names of cooperative witnesses in these categories." A "Foreword" declared that "[t]his report deals with a controversial subject," and, concentrating on the fact that the report contained an extensive list of persons, their addresses, and miscellaneous activities and associations attributed to them, made several disclaimers. The report was not to be considered an indictment of any individual, the Attorney General suitably pointing out that a grand jury was the only authority in New Hampshire having the formal power of indictment. Nor was it "the result of an inquisition. No witness in this investigation has ever, at any time, been treated other than courteously." Finally, the Attorney General stressed that "[t]he reporting of facts herein does NOT (nor should it be taken to by any reader) constitute a charge against any witness." He observed that "facts are facts . . . . Conclusions of opprobrium relative to any individual, while within the privilege of personal opinion, are neither recommended nor intended to be encouraged by any phraseology of this report." In fact, the listing of names might well contain the names of many innocent people, implied the Attorney General. This was permissible, he believed, because, as interpreted in the courts of New Hampshire, "the scope of relevant questioning in the investigation goes far beyond the requirements of individual felonious intention. In fact, the General Court has directed that inquiry be made to determine the extent of innocent or ignorant membership, affiliation or support of subversive organizations . . . ."

The report certainly is one that would be suggested by the quoted parts of the foreword. No opinion was, as a matter of course, expressed by the Attorney General as to whether any person named therein was in fact a

"subversive person" within the meaning of the statute.
The report did not disclose whether any indictments under
the 1951 Act would be sought against any person. Its
sole recommendations for legislation were for a broad evi-
dentiary statute to be applied in trials of persons under
the State Act as "subversive;" which cannot really be said
to have been the fruit of the investigation, being copied
from a then recent Act of Congress,[4] and which made
apparently no change in the 1951 law's standard of guilt,
and for an immunity measure calculated to facilitate
future investigations. The report, once the introductory
material on Communism is done with, contains primarily
an assorted list of names with descriptions of what had
been said about the named persons. In most cases, the
caveat of the Attorney General that the information
should not be understood as indicating a violation of the
New Hampshire Subversive Activities Act was, to say the
least, well-taken, in the light of the conduct ascribed to
them. Many of the biographical summaries would strike
a discerning analyst as very mild stuff indeed. In many
cases, a positive diligence was demonstrated in efforts to
add the names of individuals to a list and then render a
Scotch verdict of "not proven" in regard to them. The
most vivid example of this is the material relating to the
appellant's group, World Fellowship. After some intro-
ductory pages, there comes extensive biographical mate-
rial relating to the reported memberships, associations,
advocacies, and signings of open letters on the part of
certain speakers at the World Fellowship camp. A very
few had admitted membership in the Communist Party,
or had been "identified" as being members by third
persons generally not named. Others were said to be
or to have been members of "Communist influenced,"
"front," or "officially cited" groups. Some were said

---

[4] The Communist Control Act of 1954, § 5, c. 886, 68 Stat. 776,
50 U. S. C. § 844.

to have signed open letters and petitions against deportations, to have criticized the Federal Bureau of Investigation, to have given free medical treatment to Communist Party officials, and the like. Finally the report addresses itself to the remainder of the speakers: "Information easily available to this office does *not* indicate records of affiliation with or support of Communist causes on the part of these people. However, due to the burden of work imposed on the staff of the House Committee on Un-American Activities by thousands of such requests received from all over the country, it has not been possible to check each of these persons thoroughly. Inasmuch as no committee or public agency can hope to have all the information in its files concerning all subversive activity all over this country, it is not possible for this office to guarantee that the following individuals do not have such activity in their backgrounds. Therefore, it is necessary to report their identities to the General Court, with the explanation that based upon what information we have been able to assemble, the following individuals would appear at this time to be the usual contingent of 'dupes' and unsuspecting persons that surround almost every venture that is instigated or propelled by the 'perennials' and articulate apologists for Communists and Soviet chicanery, but of this fact we are not certain. This list does *not* include the many persons who were merely guests . . . ." The names of 36 persons with their addresses then followed.[5]

---

[5] Although the nature of the investigation of individuals is difficult to convey without reproduction of the full report, two individual write-ups from other sections of the book (the names are used in the report but not here) are illustrative.

A two-page item is entitled "The Matter of . . . [X]." It begins: "In recent years there has been opposition to legislative investigations in some academic circles. Charges have been made, usually without an accompanying scintilla of evidence, that 'hysteria' rules the country

The emphasis of the entire report is on individual guilt, individual near-guilt, and individual questionable behavior. Its flavor and tone, regardless of its introductory disclaimers, cannot help but stimulate readers

and that teachers are afraid to teach 'the truth' because of the 'witch hunters.' This line is repeated ad infinitum in the Communist 'Daily Worker.'

"In New Hampshire, during the course of this investigation, a case did arise where rumors were circulated concerning a teacher. . . ."

The report proceeds: "The teacher concerning whom the rumors were circulated was [X], a teacher in the [Y city] public school system. When the rumors concerning Mr. [X] came to the attention of this office, he was invited to testify. . . ."

The report relates that X appeared "voluntarily" and testified "fully" that he was not a member of any organization on the Attorney General's list, and never had been. "This office was prepared to make full investigation of the facts and to make public the results of such an investigation if it would effectuate the purposes of the current probe. [X] resigned and secured employment outside the state. Had [X] not decided to submit his resignation, such a course of action would have been taken; but facilities were not available for inquiring into moot problems. . . ."

The report, after noting that none of its available usual informants had anything damaging to say about X, concludes its discussion of this "matter": "It should be clear to factions who oppose per se any legislative investigation into subversion that such investigations can serve the purpose of insuring legitimate academic interests against unfounded rumor or gossip." We are left to conjecture whether Mr. X would subscribe to the Attorney General's conclusion.

An 11-page write-up is the story of Y, a Chief of Police in a New Hampshire municipality. Y admitted having been a Communist from 1936 till 1944, but said that he withdrew then, and currently regarded the Communist Party as something on a par with Hitler. A witness said that Y's name was on a secret Communist Party list after then. Pages of the details of inconclusive statements and counterstatements in this regard follow, including a "confrontation" of Chief Y and a witness in the Attorney General's office, at which were present the Board of Selectmen of the town for which he was Police Chief. The report then lists various "situations in which Chief [Y] was not able to be of assistance to this investigation" and finally comes to the "Conclusion": "Due to the conspiratorial,

to attach a "badge of infamy," *Wieman* v. *Updegraff*, 344 U. S. 183, 190–191, to the persons named in it. The authorizing Resolution requested that the Attorney General address himself to ascertaining whether there were "subversive persons" in New Hampshire, and the report indicates that this was interpreted as the making of lists of persons who were either classifiable in this amorphous category, or almost so, and the presenting of the result, as a public, official document, to the Legislature, and to the public generally. The main thrust of the Resolution itself was in terms of individual behavior—violation of the 1951 Act and the presence, in the State, of "subversive persons," were the objects of investigation. The collection of such data, and of data having some peripheral reference to it, with explicit detail as to names and places, was what the Attorney General set himself to doing in response to it. As the report itself stated, "A very considerable amount of questioning is absolutely essential to separate the wheat from the chaff in applying the legislative formula to individual conduct which involves that part of the spectrum very close to the line of subversive conduct. Only through such questioning is it possible to be able to report to the Legislature whether the activity of a given individual has been subversive or not subversive; whether or not intentionally so or knowingly so on his

---

clandestine, and currently underground nature of the Communist Party, as well as the inability to force witnesses to testify concerning subversive activities, the above conflicts in testimony here have not been resolved and are presented as they exist on the record, without further comment. . . ."

The usual individual biography is shorter and less detailed than this; many just state the individual's name and street address, set forth a reference to him in the Daily Worker or an "identification" with the Communist Party at some date or with a "front" group, and state that the subject invoked or took refuge in the privilege against self-incrimination when questioned before the Attorney General.

part." One must feel, on reading the report, that the first sentence—"A very considerable amount of questioning is absolutely essential . . . in applying the legislative formula to individual conduct which involves that part of the spectrum very close to the line of subversive conduct"—is a serious overstatement, because in the usual citation of a person in the report no expression of his innocence or guilt, or his precise coloration in the Attorney General's spectrum was given. But still the report was made in terms of the activity of named individuals. Of course, if the Attorney General had information relating to guilt under the statute, he was empowered to seek indictment and conviction of the offenders in criminal proceedings, in which of course the normal rights afforded criminal defendants and the normal limitations on state prosecution for conduct related to political association and expression, under the Constitution, would apply. The citation of names in the book does not appear to have any relation to the possibility of an orthodox or traditional criminal prosecution, and the Attorney General seems to acknowledge this. The investigation in question here was not one ancillary to a prosecution—to grand jury or trial procedure. If it had been, if a definite prosecution were undertaken, we would have that narrowed context in which to relate the State's demand for exposure. Cf. *NAACP* v. *Alabama, supra,* at 464–465. This process of relation is part and parcel of examining the "substantiality" of the State's interest in the concrete context in which it is alleged. But here we are without the aid of such a precise issue and our task requires that we look further to ascertain whether this legislative investigation, as applied in the demands made upon the appellant, is connected rationally with a discernible general legislative end to which the rights of the appellant and those whom he may represent can constitutionally be subordinated.

The Legislature, upon receiving the report, extended the
investigation for a further two years. It was during this
period that the refusals of the appellant to furnish infor-
mation with which we are now concerned took place. The
Attorney General had already published the names of
speakers at the World Fellowship camp. Now he wanted
the correspondence between Uphaus and the speakers.
The Attorney General admitted that it was unlikely that
the correspondence between Uphaus and the speakers was
going to contain a damning admission of a purpose to
advocate the overthrow of the government (presumably
of New Hampshire) by force and violence. He said
that it might indicate a sinister purpose behind the ad-
vocacy of pacifism—"the purpose of achieving a quicker
and a cheaper occupation by the Soviet Union and Com-
munism." The guest list, the nonavailability of which
to the Attorney General was commented on in the pas-
sage from the 1955 report quoted above,[6] was also desired.
Appellant's counsel, at the hearing in court giving rise
to the contempt finding under review, protested that
appellant did not want to allow the Attorney General to
have the names to expose them. The Attorney General
also wished the names of the nonprofessional help at the
camp—the cooks and dishwashers and the like. It was
objected that the cooks and dishwashers were hired from
the local labor pool and that if such employment were
attended by a trip to the Attorney General's office and
the possibility of public exposure, help might become hard
to find at the camp. This last objection was sustained in
the trial court, but the other two inquiries were allowed
and appellant's failure to respond to the one relating to
the guest list was found contemptuous.

*First.* The Court seems to experience difficulty in dis-
cerning that appellant has any standing to plead the rights

---

[6] See p. 92, *supra.*

of free speech and association he does because the material he seeks to withhold may technically belong to World Fellowship, Inc., a corporation, and may relate to the protected activities of other persons, rather than those of himself. In *NAACP* v. *Alabama, supra,* a corporation was permitted to represent its membership in pleading their rights to freedom of association for public purposes. Here appellant, as a corporate officer if one will, seeks to protect a list of those who have assembled together for public discussion on the corporation's premises. Of course this is not technically a membership list, but to distinguish *NAACP* v. *Alabama* on this ground is to miss its point. The point is that if the members of the assemblage could only plead their assembly rights themselves, the very interest being safeguarded by the Constitution here could never be protected meaningfully, since to require that the guests claim this right themselves would "result in nullification of the right at the very moment of its assertion." *Id.,* at 459. I do not think it likely that anyone would deny the right of a bookseller (including a corporate bookseller) to decline to produce the names of those who had purchased his books. Cf. *United States* v. *Rumely,* 345 U. S. 41, 57 (concurring opinion), and the opinion below in that case, 90 U. S. App. D. C. 382, 197 F. 2d 166, 172.[7]

*Second.* In examining the right of the State to obtain this information from the appellant by compulsory

---

[7] The Court, apparently, draws some support from the New Hampshire lodging house registration statute for its conclusions about the lack of substantiality of the guests' interests in nondisclosure. Since the statute admittedly would not cover what the Attorney General desired to obtain and since the New Hampshire courts themselves did not rest on it, it is difficult to find any basis for this reliance. It would be time enough to deal with a production order based on that statute when it arose.

process, we must recollect what we so recently said in *NAACP* v. *Alabama:*

"Effective ·advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly. *De Jonge* v. *Oregon,* 299 U. S. 353, 364; *Thomas* v. *Collins,* 323 U. S. 516, 530. It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an insepa-rable aspect of the· 'liberty' assured. by the Due Process Clause of the Fourteenth Amendment, which embraces freedom· of speech. See *Gitlow* v. *New York,* 268 U. S. 652,. 666; *Palko* v. *Connecticut,* 302 U. S. 319, 324; *Cantwell* v. *Connecticut,* 310 U. S. 296, 303; *Staub* v. *City of Baxley,* 355 U. S. 313, 321. Of course, it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." 357 U. S:, at 460–461.

And in examining the State's interest in carrying out a legislative investigation, as was said in a similar context in *United States* v. *Rumely, supra,* at 44, we must strive not to be "that 'blind' Court, against which Mr. Chief Justice Taft admonished in a famous passage, . . . that does not see what '[a]ll others can see and understand.' " The problem of protecting the citizen's constitutional rights from legislative investigation and exposure is a practical one, and we must take a practical, realistic approach·to it.

Most legislative investigations unavoidably involve exposure of some sort or another. But it is quite clear

that exposure was the very core, and deliberately and purposefully so, of the legislative investigation we are concerned with here. ·The Legislature had passed a broad and comprehensive statute, which included criminal sanctions. That statute was, to say the least, readily susceptible of many applications in which it might enter a constitutional danger zone. See *Yates* v. *United States,* 354 U. S. 298, 319. And it could not be applied at all insofar as it amounted to a sanction for behavior directed against the United States. *Pennsylvania* v. *Nelson,* 350 U. S. 497. Therefore, indictment would be fraught with constitutional and evidentiary problems of an obvious and hardly subtle nature. This may suggest the reason why the pattern of application of the Subversive Activities statute in New Hampshire was not through the processes of indictment. The Resolution was cast in terms of an investigation of conduct restricted by this existing statute. The Resolution and the Attorney General's implementation of it reveal the making of a choice. The choice was to reach the end of exposure through the process of investigation, backed with the contempt power and the making of reports to the Legislature, of persons and groups thought to be somehow related to offenses under the statute or, further, to an uncertain penumbra of conduct about the proscribed area of the statute. And, as was said· of the same investigation in *Sweezy* v. *New Hampshire, supra,* at 248: "[T]he program for the rooting out of subversion . . . [was] drawn without regard to the presence or absence of guilty knowledge in those affected." The sanction of exposure was applied much more widely than anyone could remotely suggest that even traditional judicial sanctions might be applied in this area.

One may accept the Court's truism that preservation of the State's existence is undoubtedly a proper purpose for legislation. But, in descending from this peak of abstraction to the facts of this case, one must ask the

question: What relation did this investigation of individual conduct have to legislative ends here? If bills of attainder were still a legitimate legislative end, it is clear that the investigations and reports might naturally have furnished the starting point (though only that) for a legislative adjudication of guilt under the 1951 Act. But what other legislative purpose was actually being fulfilled by the course taken by this investigation, with its overwhelming emphasis on individual associations and conduct?

The investigation, as revealed by the report, was overwhelmingly and predominantly a roving, self-contained investigation of individual and group behavior, and behavior in a constitutionally protected area. Its whole approach was to name names, disclose information about those named, and observe that "facts are facts." The New Hampshire Supreme Court has upheld the investigation as being a proper legislative inquiry, it is true. In Nelson v. Wyman, 99 N. H. 33, 38, 105 A. 2d 756, 763, it said: "No sound basis can exist for denying to the Legislature the power to so investigate the effectiveness of its 1951 act even though, as an incident to that general investigation, it may be necessary to inquire as to whether a particular person has violated the act. . . . When the investigation provided for is a general one, the discovery of a specific, individual violation of law is collateral and subordinate to the main object of the inquiry." In evaluating this, it must be admitted that maintenance of the separation of powers in the States is not, in and of itself, a concern of the Federal Constitution. *Sweezy* v. *New Hampshire, supra,* at 255; *Crowell* v. *Benson,* 285 U. S. 22, 57. But for an investigation in the field of the constitutionally protected freedoms of speech and assemblage to be upheld by the broad standards of relevance permissible in a legislative inquiry, some relevance to a

valid legislative purpose must be shown, and certainly the ruling made below, that under the state law the Legislature has authorized the inquiry, *Wyman* v. *Uphaus*, 100 N. H. 436, 445, 130 A. 2d 278, 285, does not conclude the issue here. The bare fact that the Legislature has authorized the inquiry does not mean that the inquiry is for a valid legislative end when viewed in the light of the federal constitutional test we must apply. Nor, while it is entitled to weight, is the determination by a state court that the inquiry relates to a valid legislative end conclusive. It is the task of this Court, as the Court recognizes in theory today, to evaluate the facts to determine if there actually has been demonstrated a valid legislative end to which the inquiry is related. With all due respect, the quoted observations of the New Hampshire Supreme Court in the case of *Nelson* v. *Wyman* bear little relationship to the course of the inquiry, as revealed by the report published after that decision. The report discloses an investigation in which the processes of law-making and law-evaluating were submerged entirely in exposure of individual behavior—in adjudication, of a sort, however much disclaimed, through the exposure process.[8] If an investigation or trial, conducted by any organ of the State, which is aimed at the application of sanctions to individual behavior is to be upheld, it must meet the traditional standards that the common law in this country has established for the application of sanctions to the individual, or a constitutionally permissible modification of them. Cf. *Kilbourn* v. *Thompson*, 103

---

[8] While as a general matter it is true that a State can distribute its governmental powers as it sees fit, as far as the Federal Constitution is concerned, it is also true that (regardless of what organ exercises the functions) different constitutional tests apply in examining state legislative and state adjudicatory powers. See *Bi-Metallic Investment Co.* v. *State Board of Equalization*, 239 U. S. 441.

U. S. 168, 195. As a bare minimum there must be general standards of conduct, substantively constitutionally proper, applied to the individual in a fair proceeding with defined issues resulting in a binding, final determination. I had not supposed that a legislative investigation of the sort practiced here provided such a framework under the Constitution.

It is not enough to say, as the Court's position I fear may amount to, that what was taking place was an investigation and until the Attorney General and the Legislature had in all the data, the precise shape of the legislative action to be taken was necessarily unknown. Investigation and exposure, in the area which we are here concerned with, are not recognized as self-contained legislative powers in themselves. See *Watkins* v. *United States, supra,* at 200. Cf. *NAACP* v. *Alabama, supra.* Since this is so, it hardly fulfills the responsibility with which this Court is charged, of protecting the constitutional rights of freedom of speech and assembly, to admit that an investigation going on indefinitely in time, roving in subject matter, and cumulative in detail in this area can be in aid of a valid legislative end, on the theory that some day it may come to some point. Even the most abusive investigation, the one most totally committed to the constitutionally impermissible end of individual adjudication through publication, could pass such a test. At the stage of this investigation that we are concerned with, it continued to be a cumulative, broad inquiry into the specific details of past individual and associational behavior in the political area. It appears to have been a classic example of "a fruitless investigation into the personal affairs of individuals." *Kilbourn* v. *Thompson, supra,* at 195. Investigation appears to have been a satisfactory end product for the State, but it cannot be so for us in this case as we

evaluate the demands of the Constitution. Nor can we accept the legislative renewal of the investigation, or the taking of other legislative measures to facilitate the investigation, as being themselves the legislative justification of the inquiry. The report indicates that it so viewed them; in requesting legislation renewing the investigation and an investigation immunity statute, the Attorney General significantly stated that if the renewal legislation or some investigatory substitute were not passed, it "would mean no further investigation, no continuing check upon Communist activities . . . ." This is just to admit the continuing existence of the investigation as a self-contained justification for the inquiry. However much the State may be content to rely on the investigation as its own sanction, I think it perfectly plain that it cannot be regarded as a justification here. Nor can the faint possibility that an already questionably broad criminal statute might be further broadened, if constitutionally permissible, be considered the subordinating legislative purpose here, particularly in the light of what the investigation was in fact as revealed by its report. Of course, after further investigation and further reports, legislation of some sort might eventuate, or at least be considered. Perhaps it might be rejected because of serious doubts as to its constitutionality—which would, I think, underline the point I am making. But on such airy speculation, I do not see how we can say that the State has made any showing that this investigation, which on its surface has an overwhelming appearance of a simple, wide-ranging exposure campaign, presents an implementation of a subordinating lawmaking interest that, as the Court concedes, the State must be shown to have.

This Court's approach to a very similar problem in *NAACP* v. *Alabama, supra,* should furnish a guide to the proper course of decision here. There the State

demonstrated a definite purpose which was admittedly within its competence. That purpose was the ascertainment whether a foreign corporation was unlawfully carrying on local activities within Alabama's borders, because not qualified to do business in the manner required by state law. In a judicial proceeding having this as its express stated purpose, the State sought to obtain the membership list of the corporation. This Court carefully recognized the curbing of associational freedom that the disclosure called for by this inquiry would entail. It then analyzed the relationship between the inquiry and this purpose, and, concluding that there was no rational connection, it held the inquiry constitutionally impermissible. Here the situation is even more extreme; there is no demonstration at all of what the legislative purpose is, outside of the investigation of violations, suspicions of violations, and conduct raising some question of violation, of an existing statute.[9] It is anomalous to say, as I fear the Court says today, that the vaguer the State's interest is, the more laxly will the Court view the matter and indulge a presumption of the existence of a valid subordinating state interest. In effect, a roving investigation and exposure of past associations and expressions in the politi-

---

[9] Cf. the address of Mr. William T. Gossett, Vice-President and General Counsel of Ford Motor Company at the Annual Brotherhood Dinner, Detroit, Michigan, November 20, 1958, in which he said:
"We must urge upon our law-makers a scrupulous exactness, particularly in the exercise of their investigative powers. When we are frustrated by the feeling that certain people—suspected subversives, gangsters or labor racketeers, for example—have flaunted society with impunity, it is tempting to pillory them through prolonged public exposure to hearsay testimony, intemperate invective and other forms of abuse. But to try by such means to destroy those whom we are unable to convict by due process of law may destroy instead the very safeguards that protect us all against tyranny and arbitrary power."

cal field is upheld because it might lead to some sort of legislation which might be sustained as constitutional, and the entire process is said to become the more defensible rather than the less because of the vagueness of the issues. The Court says that the appellant cannot argue against the exposure because this is an investigation and the exposure may make the investigation lead somewhere, possibly to legislative action. But this is just to say that an investigation, once under state law it is classified as "legislative," needs no showing of purpose beyond its own existence. A start must be made somewhere, and if the principles this Court has announced, and to which the Court today makes some deference, are to have any meaning, it must be up to the State to make some at least plausible disclosure of its lawmaking interest so that the relevance of its inquiries to it may be tested. Then the courts could begin to evaluate the justification for the impact on the individual's rights of freedom of speech and assembly. But here not only has the State failed to begin to elucidate such an interest; it has positively demonstrated, it appears to me, through its Resolution, the Attorney General's and the state courts' interpretation of it, and the Resolution's re-enactment, that what it is interested in is exposure, in lieu of prosecution, and nothing definable else.

The precise details of the inquiry we are concerned with here underlines this. The Attorney General had World Fellowship's speaker list and had already made publication of it in the fashion to which I have alluded. He had considerable other data about World Fellowship, Inc., which he had already published. What reason has been demonstrated, in terms of a legislative inquiry, for going into the matter in further depth? Outside of the fact that it might afford some further evidence as to the existence of "subversive persons" within the State, which I have

endeavored to show was not in itself a matter related to any legislative function except self-contained investigation and exposure themselves, the relevance of further detail is not demonstrated. But its damaging effect on the persons to be named in the guest list is obvious. And since the only discernible purpose of the investigation on this record is revealed to be investigation and exposure *per se,* and the relevance of the names to that purpose alone is quite apparent, this discloses the constitutional infirmity in the inquiry which requires us to strike down the adjudication of contempt in question here.

The Court describes the inquiry we must make in this matter as a balancing of interests. I think I have indicated that there has been no valid legislative interest of the State actually defined and shown in the investigation as it operated, so that there is really nothing against which the appellant's rights of association and expression can be balanced. But if some proper legislative end of the inquiry can be surmised, through what must be a process of speculation, I think it is patent that there is really no subordinating interest in it demonstrated on the part of the State. The evidence inquired about was simply an effort to get further details about an activity as to which there already were considerable details in the hands of the Attorney General. I can see no serious and substantial relationship between the furnishing of these further minutiae about what was going on at the World Fellowship camp and the process of legislation, and it is the process of legislation, the consideration of the enactment of laws, with which ultimately we are concerned. We have a detailed inquiry into an assemblage the general contours of which were already known on the one hand, and on the other the remote and speculative possibility of some sort of legislation—albeit legislation in a field where there are serious constitutional limitations. We

have this in the context of an inquiry which was in practice being conducted in its overwhelming thrust as a vehicle of exposure, and where the practice had been followed of publishing names on the basis of a "not proven" verdict. We are not asked to hold that the State cannot carry on such fact-finding at all, with or without compulsory process. Nor are we asked to hold that as a general matter compulsory process cannot be used to amass facts whose initial relevance to an ultimate legislative interest may be remote. Cf. *McGrain* v. *Daugherty,* 273 U. S. 135, 176–180.[10] We deal with a narrow and more subtle problem. We deal here with inquiries into the areas of free speech and assemblage where the process of compulsory disclosure itself tends to have a repressive effect. Cf. *Speiser* v. *Randall, supra.* We deal only with the power of the State to *compel* such a disclosure. We are asked, in this narrow context, only to give meaning to our statement in *Watkins* v. *United States, supra,* at 198, "that the mere semblance of a legislative purpose would not justify an inquiry in the face of the Bill of Rights." Here we must demand some initial showing by the State sufficient to counterbalance the interest in privacy as it relates to

---

[10] *McGrain* v. *Daugherty* found legislative justification in a congressional inquiry which presented a rather strong element of exposure of past wrongdoing, to be sure. But the possibility of legislation was much more real than is the case here, and the legislative subject matter—control and regulation of the structure and workings of an executive department—was one not fraught with the constitutional problems presented by legislation in the field of political advocacy and assembly. And the inquiry itself, most significantly, was not directed at private assembly and discussion, but at the conduct of a public official in office; it did not have the inhibitory effect on basic political freedoms · that the inquiry we are here concerned with presents. Cf. *Watkins* v. *United States; supra,* at 200, n. 33. The *Daugherty* case is basically, then, one relating to the distribution of powers among branches of the Federal Government.

freedom of speech and assembly. On any basis that has practical meaning, New Hampshire has not made such a showing here. I would reverse the judgment of the New Hampshire Supreme Court.

MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS would decide this case on the ground that appellant is being deprived of rights under the First and Fourteenth Amendments, for the reasons developed in *Adler* v. *Board of Education,* 342 U. S. 485, 508 (dissenting opinion); *Beauharnais* v. *Illinois,* 343 U. S. 250, 267, 284 (dissenting opinions). But they join MR. JUSTICE BRENNAN's dissent because he makes clear to them that New Hampshire's legislative program resulting in the incarceration of appellant for contempt violates Art. I, § 10 of the Constitution which provides that "No State shall . . . pass any Bill of Attainder." See *United States* v. *Lovett,* 328 U. S. 303, 315–318, and cases cited; *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123, 142–149 (concurring opinion).