**UNITED STATES of America**
v.
**Thomas H. WORCESTER.**
**Crim. Nos. 57–62–W, 57–63–W.**

United States District Court
D. Massachusetts.

Dec. 29, 1960.

As Amended Jan. 3, 1961.

Opinions Jan. 5 and 9, 1961.

549

Elliot Richardson, U. S. Atty., James C. Heigham, Asst. U. S. Atty., Boston, Mass., for plaintiff.

Calvin Bartlett, Brooks Beck, John L. Saltonstall, Jr., Hill, Barlow, Goodale & Adams, Boston, Mass., for Worcester.

Paul T. Smith, Boston, Mass., for Callahan.

Samuel H. Cohen, Boston, Mass., for Wm. A. Beale.

L. Johnson Callas for Richard J. Schoenfeld, Jr.

Thomas Dwyer, Boston, Mass., for Percy G. Cliff.

Frederick Roche, Boston, Mass., for May P. Norton and Lawrence Norton.

Daniel J. Connors, Boston, Mass., for Philip Murphy.

Jerome E. Rosen, Boston, Mass., for Frank K. Perkins.

WYZANSKI, District Judge.

The Court. (orally) I am grateful to counsel for refreshing my recollection on the facts and informing me of the law which they regard as controlling in these proceedings. I am not going to deal by any means with every point which was made by counsel, but there are some things which were said which I do believe deserve a preliminary set of observations.

First, I am glad that Mr. Smith recognizes that it is my view that any lawyer worthy of his salt will on behalf of his client make whatever arguments seem to him to be professionally warranted, regardless of any risk of offense, if any risk there be, to the Judge who is sitting; and I hope that at no time will any lawyer have any doubt that I welcome as bold an assault as the facts and the law warrant.

On a number of different occasions during his first and his last argument, Mr. Smith referred to this as though it were perhaps a Grand Jury proceeding or one that ought to be a Grand Jury proceeding. It seems we have forgotten that this is a proceeding consequent upon an alleged failure of Worcester to perform his duty before a Grand Jury.

There has been no want of a Grand Jury proceeding. On the contrary, this is Step 2 of which Step 1 was a Grand Jury proceeding, which led to a complaint filed by the United States Attorney.

I am not going to make any reference to the numerous characterizations which, in a parade of horribles, Mr. Smith marched forth, at the beginning of the argument, as descriptive, as he said, in my words of what this proceeding involves. Some of the quotations were accurate; some were in a context, or with a slant for which I bespeak consideration of the original transcript.

Moreover, there was in Mr. Smith's argument a reiterated playing upon the symbolism, as though it were from Herman Melville, of the Whale and the Red Herring. With due regard for the dramatic device, I cannot refrain from referring again to the record, itself. The record, itself, will, I am sure, show that in the course of an examination of a witness by a counsel, another counsel objected on the ground that the first counsel was engaged in a fishing expedition. It was in relation to that objection that I said that the first counsel seemed to be after a whale and not after a red herring. It was not I that was looking for Leviathan.

It would be idle for me to pretend that only this afternoon have I addressed myself to the very serious problems which underlie these motions. On at least five occasions I have had the deepest self-scrutiny with regard to whether these proceedings should be cast in this form.

First, when I wrote the letter to Mr. Bartlett, from which he has quoted, I was aware of some, though not all, of the serious legal and moral problems which were involved, and before I wrote that letter I considered with great care, and with no little research, the problems involved.

Second, when I received from Mr. Richardson, in his capacity as United States Attorney, the complaint which initiated these revocation proceedings, I once again had the opportunity to, and exercised the opportunity to, consider the legal and moral problems. My frame of reference was at each stage of the consideration widened by new facts.

Third, as the hearings proceeded, and I issued the subpoena now under challenge, I was aware that it once more was incumbent upon me to consider whether, as a matter of law and as a matter of sound moral policy, it was desirable to go

ahead, and on this third occasion I again studied what I regarded as the precedents and the wider problems.

The fourth occasion came when, 10 days ago, Mr. Smith filed the motions which seemed to me, despite the fact the Court of Appeals did not seem to think so, to be a brief setting forth his position, no less than a pleading setting forth his position. Thus, I had the advantage of an overt challenge with reference to specific points and, as Mr. Smith, himself, said, such a challenge was due in a proper way. It always helps a Judge to be effectively challenged. The ancient Greek Heraclitus said, "Strife is the source of all things." Lawyers and Judges know that on the anvil of debate much is hammered out that otherwise would have remained unshapen metal.

A fifth occasion came when Mr. Smith, on behalf of Mr. Callahan, made me, quite properly, as far as the procedure goes, a respondent in connection with a Petition for a Writ of Mandamus and for a Writ of Prohibition. Thus, once again, being likely, myself, to be a person from whom a formal Answer might be required by an Appellate Court, I studied the authorities and what seemed to me to be the controlling principles.

It would be naive for me to claim that I had not reduced my ideas to writing. And though I think I might be able, without too much effort, to reproduce the whole of the 45 pages orally, I prefer to, and now do file a Memorandum of my reasons for denying, as I now do deny, all four motions [handing to the Clerk the document herein called "Opinion of Dec. 29, 1960," set forth below].

Mr. Smith. If your Honor please, would your Honor now accept a Motion to Stay the Proceedings in so far as the witness Callahan is concerned the proceeding before the Court of Appeals? Certainly, may I suggest to the Court, a day is not going to be that important to this proceeding that has been going on here.

The Court. The only reason I am not going to do that, Mr. Smith, is I think you will have to see from my Memorandum

that there is only one effective way—it is a terribly perilous one—to challenge this Court.

Mr. Smith. I understand what your Honor is going to say: take the chance of going to jail for contempt.

The Court. I think it is the only way. Therefore, I won't grant a stay because I don't think there is any other review except at peril.

Opinion of Dec. 29, 1960, as amended Jan. 3, 1961.

On December 19, 1960 Paul T. Smith, Esq., on behalf of William F. Callahan, filed four motions: (1) to quash a *subpoena ad testificandum* addressed to William F. Callahan, (2) to "cease, confine, stay" the present proceedings, (3) to strike evidence, and (4) to strike or limit evidence.

The following is an abbreviated account of the background to these motions.

1. (a) Thomas H. Worcester and various corporations, including Thomas Worcester Inc., of which he was president, have for many years been engaged in the engineering business. They have had numerous contracts with private and public agencies, including the Commonwealth of Massachusetts, and its agencies the Department of Public Works and the Massachusetts Turnpike Authority.

1. (b) At various times William F. Callahan has been the chairman of the DPW and the MTA, and of the latter he is now chairman.

1. (c) Following an intensive investigation by the Federal Internal Revenue Service, the Grand Jury of this District in 1957 in two indictments, hereafter called one case, indicted for wilful evasion of the federal tax laws Worcester individually and Thomas Worcester, Inc.

1. (d) In accordance with the system of assignment by lot prevailing in this District, the case was assigned forthwith to Judge William T. McCarthy. He held some pre-trial sessions, but he had not tried the case when in June 1960 he retired. In late June or early July the case was re-assigned to me, and in July

I set the case down for trial in August 1960 before a court and jury.

1. (e) In the course of a thirteen day trial before me, testimony indicated that, with the active participation of Worcester, personally, the corporation paid about $275,000 to one Francis Norton as a purported salesman to secure contracts for the corporation with various public bodies. The evidence was strongly suggestive of the possibility that Norton had passed on some of the money as bribes to public officials. Also the evidence indicated that with Worcester's knowledge the corporation, nonetheless, in its federal corporate income taxes had taken the payments to Norton as deductions from gross income, on the claim that they were "ordinary and necessary [business] expenses." Internal Rev.Code § 23(a) (1) (A); 53 Stat. 12, as amended, 56 Stat. 819, 26 U.S.C.A. § 23(a) (1) (A). Tank Truck Rentals v. C.I.R., 356 U.S. 30, 33, 78 S.Ct. 507, 2 L.Ed.2d 562; Textile Mills Securities Corp. v. C.I.R., 314 U.S. 326, 62 S.Ct. 272, 86 L.Ed. 249; Rugel v. C.I.R., 8 Cir., 127 F.2d 393.

1. (f) This Court in its charge instructed the jury that if Worcester knowingly, and being aware of the character of the payments, participated in taking such deductions, he was guilty of a wilful violation of what was then § 145(b) of the Internal Revenue Code of 1939. 26 U.S.C. § 145(b).

1. (g) The jury on September 5, 1960 convicted Worcester on the two indictments.

1. (h) This Court, being persuaded that the testimony indicated that Worcester had derived no large financial benefit from his wrongdoing wrote, and filed in the court records, the following letter, dated September 9, 1960, to his counsel, Calvin P. Bartlett, Esq.:

"Dear Mr. Bartlett:

"I am writing this letter to you, as counsel for Thomas H. Worcester. I shall send a copy to the United States Attorney, and shall place another copy in the open records of the Clerk's office.

"As you will recall, at an earlier date I stated to you, in the presence of the United States Attorney, that if Worcester were to be convicted by the jury I would impose upon him a prison sentence of 18 months.

"The jury has now returned verdicts of guilty against Worcester. I regard these verdicts as according to law and just. But I firmly believe, and I should not be surprised if many of the jurors believe, that in his tax evasion crimes Worcester was seeking to keep in business as much for the sake of his staff as for his own sake, that personally he derived no substantial gain, and that the money which was improperly reported was paid directly or indirectly to a conduit for dishonorable public officials, and probably ultimately to those corrupt officials themselves.

"I am persuaded, and perhaps the jury too was persuaded, by two of your convincingly presented arguments. First, I am confident that Worcester's net worth was not increased substantially, if at all, by his tax evasions. Second, Worcester was the victim of the criminal conduct of others. You have suggested that the others were officers, employees or agents of Thomas Worcester, Inc. I am of the view that they were officers, employees, or agents of the Commonwealth of Massachusetts.

"In my opinion it would now be just for me to offer, and I do herewith officially offer, to impose upon Thomas Worcester a sentence of 18 months, to be *suspended* and the defendant to be placed on *probation* on the express condition that, to my satisfaction, he shall cooperate with, and give full, candid testimony to any national, state, or local prosecutor, grand jury, petit jury, legislative body, legislative committee, or authorized public agency of inquiry concerning any matter directly or indirectly relevant to those matters covered in the trial before me.

"This offer is *not* an example either of maudlin sentimentality or of magnanimity. It is designed to strike a just mean.

"This offer is *not* calculated to place pressure on Worcester to become an informer on his friends. The men who received the benefits of the tax evasion were not his friends. Nor are they friends of any civic-minded person. Nor is the Court placing Worcester under pressure. Indeed its object is to relieve him of consequences he may otherwise sustain as the result of the pressure wrongfully placed upon him by public officials who admittedly devised a preferred list of persons to whom they would give public business.

"Finally, let me assure you—who need no such assurance—that the professional skill and courage with which you represented your client have enabled me to see aspects of the case to which I might otherwise have been blind. Of course, if your professional advice or any other cause leads you or your client not to welcome this offer but inclines you or him to run the risk of the 18 months sentence which I originally said I would impose, and to seek by appeal or otherwise a complete vindication of the innocence or asserted innocence of Worcester, I shall in no way resent your or his selection of that option. The choice is in the hands of your client, guided by your skill, wisdom, and high character.

"Faithfully,

"Charles E. Wyzanski, Jr."

1. (i) Mr. Bartlett, on behalf of Worcester, accepted this proposal by a letter, dated September 15, 1960, also filed in the court records.

1. (j) Then on September 21, 1960, in open court, in 57–62–W this Court "adjudged that defendant [Worcester] is sentenced to 18 months imprisonment. Execution of prison sentence suspended and defendant is placed on probation for 5 years. Prison sentence and probation to run concurrently and to run concurrently with prison sentence and probation period in indictment 57–63. Probation is on the condition that the defendant, to the satisfaction of the United States District Court, give full, candid testimony to any national, state, or local prosecutor, grand jury, petit jury, legislative body, legislative committee, or authorized public agency of inquiry concerning any matter directly or indirectly relevant to those matters covered in the trial of this indictment." In 57–63–W, this Court on the same day imposed substantially the same sentence to run concurrently with the sentence in 57–62–W.

2. This Court declares that, on the date of sentencing, it assumed that, at an early date, the United States District Attorney would summon Worcester to testify before the United States grand jury, that, (in view of the letters by the Court, dated Sept. 6, 1960, addressed to Calvin P. Bartlett, Esq., and by Calvin P. Bartlett, Esq., dated Sept. 15, 1960, addressed to the Court, and the statements at the time of sentencing made by the Court and by Worcester himself,) Worcester would give full, candid testimony *in camera* to the grand jury, and that this Court would have no further occasion to consider the matter.

3. On September 28, 1960, United States District Attorney Elliot Richardson summoned Worcester before the Grand Jury of this District. There Worcester gave testimony, of which a transcript was kept. On October 4, 1960, Mr. Richardson, at Mr. Bartlett's request and in his presence, had a further session before a notary public in the United States District Attorney's office, of which a transcript was also kept.

4. October 27, 1960 the United States District Attorney filed in this Court his "complaint of failure to comply with condition of probation". The complaint alleged that "The testimony of Worcester before the Grand Jury * * * does not, in the opinion of the United States Attorney, fulfill the aforesaid condition of Worcester's probation," "submitted that a fair reading of both transcripts [before

the grand jury and before the United States Attorney] make it clear that Worcester was and is withholding information", and prayed that "the Court revoke the probation of the defendant Worcester and require him to serve the sentence imposed or such lesser sentence as it shall deem appropriate."

5. The same day, at 11:45 A.M., the Court directed "the clerk to issue an order to show cause, returnable October 28, at 9:30 A.M., why the probation of Thomas Worcester should not be revoked. Pursuant to the request of Mr. Bartlett, counsel for Worcester, I remove all restrictions of secrecy upon the transcripts of the Grand Jury transmitted with this complaint, such transcripts being necessary to a fair hearing upon the complaint."

6. Oct. 28, this Court held its hearing pursuant to the rule to show cause. This Court declares that, on the morning of the hearing, it assumed that the United States Attorney surely and Worcester's attorney probably would let the Court make its determination exclusively upon the transcripts annexed to the complaint. However, out of an abundance of caution, this Court inquired whether either counsel wished to supplement the transcripts with oral testimony. Mr. Bartlett then indicated that he wished to offer *viva voce* testimony, that he had in mind calling as witnesses persons referred to in the transcripts, and that he needed a postponement or adjournment fairly to present the case on behalf of Worcester. The Court thereupon adjourned the case until Nov. 4, 1960.

7. Shortly after this Court, on October 27, at 11:45 A.M., had removed the restrictions upon the transcripts, William Callahan and Mary Norton separately made statements, outside of court, not under oath, released to the press. These statements flatly contradicted Worcester's testimony before the grand jury.

8. When this Court resumed its hearing on Nov. 4, 1960 this Court stated (pp. 2, 3) that it regarded "this as being analogous to a proceeding in which a person appearing before a Grand Jury is regarded by the United States Attorney as having committed before that body an act of perjury.

"A person who appears before a Grand Jury is sworn to tell the truth, the whole truth and nothing but the truth. If, in the opinion of the United States Attorney, the individual fails to tell 'the truth', the United States Attorney would have the option of seeking to proceed by way of an indictment for perjury, or by way of an application for contempt.

"If he chose to proceed by way of an application for contempt, obviously the total record before the Grand Jury would be part of the record before the United States District Court. In this connection, the record would naturally be a public record. Despite newspaper and other statements to the contrary, there is nothing unusual about the disclosure in such circumstances of the total record before the Court. In fact, the failure so to disclose would be a defiance of the Constitutional mandate with respect to public trial.

"In this particular proceeding, because of the nature of the Court's order imposing the sentence and placing the defendant Worcester on probation, the United States Attorney has available to him, in addition to the usual remedies by way of indictment for perjury, [and] an application to the Court for a proceeding by way of contempt, an application for revocation of Worcester's probation. The United States Attorney has chosen to follow the third of the optional procedures open to him."

9. At the Nov. 4 hearing Worcester's counsel began by calling John G. Curley, Henry M. Santosuosso, Vincent J. Shanley, Katherine B. Ross, William J. Wallace, and (for a purely technical point) Walter Powers, Jr. Contrary to the assumptions which the Court had previously entertained, the hearing grew in scope, and it became transparent that, as contradiction followed contradiction, and ramifications indicated possible holes in Worcester's story before the grand jury, the Court would be required to sit longer than it had expected for the taking of

relevant testimony. The Court, giving priority to its emergency business, such other cases as were ready for trial, and such other judicial business as it had to do in Boston or elsewhere, continued to conduct hearings, not always on successive days, in this Worcester matter.

10. As it became apparent that the testimony might reflect upon others than Worcester and might prejudice persons called as witnesses, this Court, on its own motion, took steps designed to extend the maximum of protection to such persons— a degree of protection exceeding any familiar requirement prescribed by the United States Constitution, by precedent, or by the commonly received standards of fairness. On its own initiative, this Court stated repeatedly, and perhaps most fully at pages 1, 2 and 4, 5 of the transcript of November 25, 1960, that it would allow witnesses to have their own counsel, and that such counsel would be allowed to examine, cross-examine, subpoena witnesses, object, argue, and file briefs. I cited the statement of a former English Lord Chancellor, The Earl Jowitt, that in England "When we set up a tribunal of investigation * * * we always arrange that anyone whose conduct is under investigation shall have the right to be represented by counsel and to hear all that can be said against him." I added, in speaking to a particular witness, typical of many witnesses, "This is, of course, not an investigation of you; this is a proceeding in connection with the revocation or possible revocation of probation of Thomas Worcester and in no formal sense are you 'under investigation.'

"Nonetheless, I am aware * * * that some persons might wrongly suppose that this is a proceeding directed at you or at others than Thomas Worcester, which it is not. And I think it is important that if you feel that your rights require that other testimony be given on your behalf, or that you have yourself examined by your own counsel in addition to other counsel, or if you feel it important that you should be cross examined or that somebody else should be cross examined, or if you feel it important that there should be additional testimony offered or additional witnesses summoned or additional argument presented, I do not want you, at any time, to feel that you did not have the opportunity, if you wished it, to have an advocate to speak for you, to examine for you, present your views.

"You are really here as a witness, but a witness in a rather different proceeding than that which is sometimes faced by a criminal court. You are more like a witness in a proceeding of investigation and therefore I wanted to give you whatever opportunity you wished."

11. As a further safeguard for witnesses and others who might possibly be affected by the revocation proceedings, this Court urged the United States Attorney to order for the Court as well as for the Department of Justice a daily copy of the transcript. The Court announced that this transcript would be available for inspection by anyone at any reasonable time.

12. Taking advantage of these opportunities, counsel for Callahan, as his motions show, had complete, unrestrained access to the transcript on a current basis and with adequate opportunity to copy citations.

13. Taking advantage of these opportunities, counsel for witness Schoenfeld examined witness Flynn on December 20. Other lawyers examined other witnesses.

14. During his testimony on Nov. 14, at p. 83, Worcester, responding to his own counsel's question, flatly denied the veracity of a statement attributed to Callahan by The Boston Traveler, Friday, Aug. 28, 1960. This statement categorically contradicted Worcester's testimony that he had given Mrs. Norton cash which she put in Callahan's overcoat pocket.

15. Wishing to spare Callahan even the appearance of being summoned, expecting from Callahan little more than a voluntary restatement under oath of what he had rushed into print to say out of court, and aware that if Callahan left

556

uncontradicted under oath Worcester's sworn testimony, a Court would probably be led to make an explicit finding that Worcester had given money to Callahan, I, as shown at p. 86 of the testimony of Nov. 14, directed the Clerk to send a telegram giving him an opportunity to appear voluntarily.

16. Callahan's secretary telephoned the Clerk that he would not come voluntarily. The Court, at pp. 1–5 of the transcript for No. 15, after reciting the message from Callahan's secretary, the affidavit of Mrs. Ross referring to Callahan, and Worcester's testimony involving Callahan, issued the subpoena which Callahan's counsel challenges in the first motion now before the Court.

17. Contrary to this Court's assumption, the testimony offered supporting and rebutting the United States Attorney's complaint has occupied many days. Frequently, this Court incorrectly estimated that the examination of witnesses would be rapidly concluded. But, mindful of the gravity of the central issue as to Worcester's candor, and determined to vindicate or refute Worcester's claim he had complied with the Court's order placing him on probation, counsel have exhaustively explored all relevant aspects. In this they have been encouraged by the Court. Moreover, not always persuaded that the witnesses were obedient to their oath to tell the whole truth, the Court itself has asked questions of the witnesses. No objection was contemporaneously made, despite unfettered opportunity for any counsel to object.

It is against this background of fact, fully revealed in the available transcript, that this Court now addresses itself to the relevant issues of law and discretion presented for decision.

### A.

*Power of the Court to impose upon Worcester a sentence placing him upon probation conditioned upon his disclosure of evidence relevant to the crime of which he was convicted.*

■ 1. 18 U.S.C. § 3651 provides that "upon entering a judgment of conviction * * * any court * * * when satisfied that the ends of justice and the best interest of the public as well as the defendant will be served thereby, may suspend the imposition or execution of sentence and place the defendant on probation * * * upon such terms and conditions as the court deems best."

2. There is no room to doubt that the foregoing section empowers a United States Court to impose the conditions of disclosure set forth in Worcester's sentence. Indeed, in 1956 in Kaplan v. United States, 8 Cir., 234 F.2d 345, the Eighth Circuit held that even where the trial court at the time of sentencing a defendant had failed specifically to stipulate as a condition of probation that the defendant make further disclosures to the grand jury, "the * * * defendant * * * while on probation" could be "specifically ordered by the court to appear before the grand jury and disclose the source of his heroin purchases" for which he had been convicted. (at page 347). "No claim of constitutional privilege was or could have been maintained." (at page 347). The Eighth Circuit, in the light of these obvious considerations, held that defendant's "refusal to follow the court's direction that he disclose to the grand jury the source of his heroin was a sufficient ground for the revocation of probation and we think that the trial court did not abuse its discretion in so doing." (at page 349).

■ 3. Indeed, it is abundantly clear that, even when conditions of probation are not in any way involved, and even where there is no relevant immunity statute, a court may require a person already convicted of crime, despite the fact that he is serving a sentence for that crime, fully to disclose who were his associates, and what parts they played in the crime. Reina v. United States, 81 S.Ct. 260, 264. "The ordinary rule is that once a person is convicted of a crime, he no longer has the privilege against self-incrimination as he can no longer be incriminated by his testimony about said crime." As Chief Justice Warren said in reply to a contrary argument, "He

may have paid his obligation to society to serve his term, but he has not paid his obligation to give the facts."

## B.

*Power of the Court to conduct a public hearing to determine whether Worcester has violated the condition of his probation.*

4. When the Court receives information that indicates that a probationer has violated the conditions of his sentence, the Court has a duty to afford the probationer a hearing. Escoe v. Zerbst, 295 U.S. 490, 55 S.Ct. 818, 79 L.Ed. 1566, interpreting what is now 18 U.S.C. § 3653. The Act of June 16, 1933, c. 97, 48 Stat. 256, formerly 18 U.S.C. Supp. § 725, now 18 U.S.C. § 3653 provides that "the probationer shall be taken before the court." This legislative command means, said Mr. Justice Cardozo, that "there shall be an inquiry so fitted in its range to the needs of the occasion as to justify the conclusion that discretion has not been abused by the failure of the inquisitor to carry the probe deeper." 295 U.S. at page 493, 55 S.Ct. at page 820. "When a hearing is allowed but there is error in conducting it or in limiting its scope, the remedy is by appeal." At page 494, 55 S.Ct. at page 820.

5. The ordinary rule is that the hearing should be public to avoid any question under Amendment VI to the United States Constitution, stipulating that "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." Strictly construed, the Amendment may not reach a post-conviction stage of a criminal proceeding involving not the ascertainment of guilt, but the revocation of a probation granted by the sentence imposed. However, in the light of the divided vote in Levine v. United States, 1960, 362 U.S. 610, 80 S.Ct. 1038, 4 L.Ed.2d 989, commented on in 74 Harv. L.Rev. 81, 144, it would be imprudent for a lower court, except for good cause, to conduct the revocation proceedings in secret. See also Note, (1951), 65 Harv.L. Rev. 309.

6. Moreover, the nearest analogy to a revocation of probation proceeding involving the issue whether the probationer told the whole truth to a grand jury, is a contempt proceeding involving the issue whether a witness told the whole truth to a grand jury. In the latter case, the approved procedure is for a court to hold a public plenary hearing in which the prosecution offers in evidence relevant parts of the grand jury transcript and the court takes testimony in open court from the allegedly contemptuous witness and others who have relevant evidence. In re Reina, D.C.S.D.N.Y., 170 F.Supp. 592, affirmed, United States v. Reina, 2 Cir., 273 F.2d 234; affirmed 81 S.Ct. 260.

7. It is paradoxical to suggest that a court errs when it conducts a revocation of probation proceeding in public instead of private. Every court hearing, at least in criminal cases, has as one of its principal objects to assure the public that justice is being done. This is a special instance of the familiar maxim that justice must not only be done, but also be seen to be done.

8. In the profoundest sense, publicity is part of the educational process of a democracy. It is the outward symbol of the inner health of the system of public order. It is a safeguard against a corrupt, or incompetent, or inert judiciary. As Mr. Justice Black said in In re Oliver, 1958, 333 U.S. 257, 270, 68 S.Ct. 499, 506, 92 L.Ed. 682, "The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power." In accord are Holmes, J., in Cowley v. Pulsifer, 137 Mass. 392, 394; 1 Cooley, Constitutional Limitations, (8th ed., 1927) at p. 647; and 1 Bentham, Rationale of Judicial Evidence, (1827), p. 524.

9. The public character of a hearing has a particular advantage to a defendant, probationer, or other party. He knows who are the witnesses against him, and what they say. He can effectively insist that "their cross-examination should not be curtailed summarily * * *

especially when it has a direct bearing on the substantial issues of the case." Stone, J., in District of Columbia v. Clawans, 1937, 300 U.S. 617, 630–631, 57 S.Ct. 660, 665, 81 L.Ed. 843. Moreover, he has his own lawyer present. That lawyer has the right to call witnesses, to cross examine, to object, to argue, to file pleadings, and to submit briefs.

10. It is not without significance, that in the case at bar it was the probationer, Worcester, who sought and was granted the opportunity to offer evidence and call witnesses in open court. He makes no complaint that his request was granted.

■ 11. It is more than doubtful if as a mere witness, Callahan, has any standing to object to the open character of the hearing to which he is summoned.

12. If Callahan has a standing to object, his objection is without merit. There is no general rule that a person summoned to give relevant evidence has a privilege to give it in private. If his testimony will be embarrassing or disgraceful that is not a consideration which outweighs the considerations that a party and the public are entitled to have given in public the truth, the whole truth, and nothing but the truth, so far as relevant to an issue in the proceeding.

■ 13. Of course, after responding to a subpoena, the witness has the right to decline to answer a particular question on the ground that it is irrelevant, immaterial, or invades a privilege he seasonably and properly claims.

14. But a witness has no just claim that, because of the publicity from which he suffers, a court shall "cease, confine, or stay" a public proceeding involving possible revocation of another's probation. The argument that such a proceeding is in some sense a one-man grand jury proceeding is without historical or other support.

15. A grand jury is an accusatorial body. Its function is wholly different from that of a court determining whether to revoke a probation imposed by its own sentence.

16. In our day it is certainly the rule for a grand jury to sit privately, and for its members, in accord with Rule 6(e) of the Rules of Criminal Procedure, 18 U.S. C., to be sworn to secrecy. See, in general, Pittsburgh Plate Glass Co. v. U. S., 1959, 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed. 2d 1323. Yet this secret aspect of the grand jury was not fully established until after the reign of Charles II. Trial of Shaftesbury, 3 Harg.St.Tr. 417, cited in 4 Bl.Com. (14th ed., 1803) 303, note 1; 1 Holdsworth, Hist. of Eng.Law, (2nd ed., 1927) p. 322, note 7; Note (1921) The Grand Jury, 21 Col.L.Rev. 376. In the early days the grand jury acted publicly solely on hearsay. Thayer, A Preliminary Treatise on Evidence of The Common Law, pp. 130–132; P. H. Winfield, The History of Conspiracy and Abuse of Legal Procedure, p. 77. As late as the Seventeenth Century, though by then it heard witnesses, it heard them in public, and the government was thought to have the right to demand such public confrontation. Trial of Shaftesbury; Holdsworth; both cited above. Secrecy was deplored by Jeremy Bentham, Rationale of Judicial Evidence, Bk. II, c. 10. But, nonetheless, secrecy is now the universal practice.

17. The reasons for secrecy have so recently been analyzed by Mr. Justice Brennan at page 405 of 360 U.S., at page 1243 of 79 S.Ct. of the Pittsburgh Plate Glass Co. case that they do not need restatement. But it may be emphasized that, like Cummings and McFarland, Federal Justice, p. 366, note 1, and the Seventeenth Century tract, The Security of Englishmen's Lives (1681) cited in note 6 in 21 Col.L.Rev. 376, Mr. Justice Brennan gives as the first reason for secrecy the risk lest the suspected person escape justice. A secondary reason is that the same suspected person (not a person whose name is incidentally drawn into the evidence) be protected from derogatory information.

18. It has been suggested that other advantages of secrecy are that complainants, witnesses, and grand jurors will be less inhibited if their words

are veiled. Pittsburgh Plate Glass Co. v. U. S., 360 U.S. 395, 400, 405, 79 S.Ct. 1237; 21 Col.L.Rev. 376, 378, note 20; Chafee, Blessings of Liberty, (Phila. and N.Y., 1956), p. 219. But it may be doubted whether those who whisper delations to the grand jury are more reliable than were the Renaissance calumniators who dropped unsigned notes in the box in the Doges' Palace in Venice. Cf. Henry Matusow, False Witness, (Cameron & Khan, N.Y., 1955). Moreover, while testimony before a grand jury is excluded from the operation of the Jencks Act, 71 Stat. 595, 18 U.S.C. § 3500, and from the holding in Jencks v. United States, 1957, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, a trial judge, in the exercise of his discretion, may order the minutes of a grand jury witness produced for use on his cross-examination at trial. United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 234, 60 S.Ct. 811, 84 L.Ed. 1129; United States v. Procter & Gamble, 1958, 356 U.S. 677, 683, 78 S.Ct. 983, 2 L.Ed.2d 1077; Pittsburgh Plate Glass Co. v. U. S., 1959, 360 U.S. 395, 400, 409–410, 79 S.Ct. 1237.

19. Furthermore, England, to whom we owe the grand jury, has long since abolished it and substituted, as the usual alternative, (except in a few cases where judges receive in secret testimony against a culprit), the offering in public before examining magistrates of the evidence upon which the prosecution intends to rely at the trial itself. Indictable Offenses Act, 1848; Summary Jurisdiction Act, 1879; Magistrates' Courts Act, 1952. See Sir Patrick Devlin, The Criminal Prosecution in England (Yale 1958) ch. 4, pp. 107, 112, 113, 117. Far from objecting to such advance disclosures, defendants insist on them. Indeed they object to any evidence offered at the trial which was not so disclosed (p. 113).

20. Defendants in England do not appear to have felt that they suffer prejudice from the risk that the examining magistrates, through error, will admit in the preliminary committal proceedings evidence which is not ultimately admitted against them in the full trial, and that such error, if widely publicized in advance of trial, will infect the minds of the petit jurors. (pp. 117, 118).

21. So far as appears, in England no prospective witnesses or others have raised objections to disclosures at the magistrates' preliminary stage of evidence that may or may not be offered at the trial itself.

22. Of course, it can be said, and will be said, that English practice is irrelevant because Americans are unlike Englishmen. Our prosecutors, magistrates, juries, judges, press, and other media of communication do not always exhibit characteristic British understatement and self-restraint. And there is both a real and a technical difference between a magistrate's hearing preliminary to a trial and a judge's post-conviction hearing on revocation of probation. But there is, nonetheless, this similarity: in both, innocent third persons may have their names sullied and smirched by popular association with defendants. Yet in each the overriding considerations are that the public and the defendant are entitled to a public inquiry.

23. In short, this revocation proceeding is not the analogy of a grand jury proceeding. Even if it were analogous, there would be nothing in those considerations of policy which keep secret grand jury proceedings that ought to be governing considerations of policy to keep secret these proceedings. Indeed, recent developments, such as the Jencks rule and the Jencks statute as well as the English transmutation of accusatorial procedure, all suggest that publicity rather than privacy is the proper atmosphere for the procedure of revocation of probation.

24. Nor can it be said that privacy ought to be maintained in the case at bar because here testimony may run unconfined and that there is no such hedge as the grand jury proceedings supply. The truth is precisely the reverse.

25. A grand jury can roam almost at will. If often does. What else is meant by the phrase "a runaway grand jury"? The witness called before it cannot effectively claim that neither he nor

it know what the charge is or will be. Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652.

26. In the present proceedings, on the contrary, the issues are plainly cabined. Nothing is relevant unless it relates to the claim that Worcester failed fully to disclose "matters covered in the trial of" indictments in Cr. Nos. 57–62 or 57–63. There are fixed points of reference to determine relevance.

27. Here, if error is made by the trial court in admitting or excluding evidence, there is a review. For the defendant, "the remedy is by appeal" from a revocation of probation, if revocation occurs. Escoe v. Zerbst, 295 U.S. 490, 494, 55 S.Ct. 818, 79 L.Ed. 1566. For a witness, the remedy is to refuse to answer, to run the risk of citations for civil and criminal contempt, and, from an adverse determination, to appeal. Reina v. United States, 81 S.Ct. 260; Uphaus v. Wyman, 360 U.S. 72, 79 S.Ct. 1040, 3 L.Ed.2d 1090.

C.

*Power of the Court to Summon and to Interrogate Witnesses*

■ 28. The starting point in considering the status of the judge in these revocation proceedings is Mr. Justice Cardozo's characterization of his appropriate role as that of an "inquisitor". Escoe v. Zerbst, 1935, 295 U.S. 490, 493, 55 S.Ct. 818. With deference to one of the greatest of judges, it seems to me that his characterization may have connotations too broad, and too historically alarming, to be entirely satisfactory. Yet the Supreme Court surely intended to draw to the attention of the lower courts that in proceedings involving revocations or probation, as indeed in all aspects of probation, the judges exercise functions of administration as well as functions of inquiry and adjudication which differ from those in the usual adversary proceedings or in the main body of a criminal trial.

29. In adversary proceedings, and especially in a criminal trial, much is to be said for a judge maintaining an attitude of aloofness. Glanville Williams, The Proof of Guilt, (2nd ed., 1953) p. 4. Not less than others, I deserve to be reminded of "the classic advice to a * * * judge * * * that he should take a sup of holy water in his mouth at the beginning of a case, and not swallow it until the evidence on both sides has been heard". Ibid, p. 26. In their celebrated History of English Law (2nd ed.), vol. II, p. 671, Pollock and Maitland taught us that from its earliest days our law has looked upon the judge as, in many aspects, (but not all, see Hughes, C. J.'s description of the trial judge as the "governor of the trial," Quercia v. U. S., 289 U.S. 466, 469, 53 S.Ct. 698, 77 L.Ed. 1321) a neutral like an umpire in a cricket match who asks only "How's that?". Lord Hewart phrased the judge's role more owlishly: "the business of a judge is to hold his tongue until the last possible moment, and to try to be as wise as he is paid to look." G. Williams, op. cit, p. 26.

■ 30. But these austere standards of reserve, so difficult for some of us, are never quite imperative when the nature of the proceedings is administrative. The judge, considering revocation, is not only ascertaining facts. He is constantly concerned with what Mr. Justice Cardozo called a "probe". Escoe v. Zerbst, 1935, 290 U.S. 490, 493, 55 S.Ct. 818, 79 L.Ed. 1566. He is concerned not with guilt but with punishment. He is to decide what is a proper disposition, taking into account, but not relying exclusively upon, what the parties have chosen to place before him. He is to determine what disposition will reflect the deepest public concerns, their interests in individual liberty, in the common weal, and in moral responsibility.

■ 31. Against this background of obligation, a judge is clearly warranted, on his own initiative, in summoning a witness who has relevant testimony. See G. Williams, The Proof of Guilt, (2nd ed., 1953) p. 35; Wyzanski, A Trial Judge's Freedom and Responsibility, (1952) 65 Harv.L.Rev. 1281, 1293–1294. Cf. the broad language of Rule 17(a) of

the Rules of Criminal Procedure. Indeed in some revocation proceedings, he might be the only one on whom an unrepresented, uninformed, or indigent defendant could rely to subpoena a necessary witness. See Rule 17(b) of the Rules of Criminal Procedure. Or in a case where the prosecution, having secured a conviction, was indifferent to post-conviction problems, the judge again might be the only available source of a summons indispensable to achieve a just result.

32. In the case at bar there were many adequate, nay compelling, reasons to require testimony from Callahan. The defendant Worcester had given evidence indicating he had paid money to Mrs. Norton who, in or out of his presence, slipped it into Callahan's overcoat pocket. In an out-of-court statement, Callahan had given the press a flat contradiction. Furthermore, Mrs. Ross, in affidavit and oral testimony, had given evidence suggesting that Worcester had made a conscious effort to avoid public contacts with Callahan. These testimonial items, which may be entirely unreliable, require confirmation or contradiction under oath, and court confrontation. No one else having summoned Callahan, this Court had the obligation so to do.

33. Callahan's counsel has objected not only to the summons addressed to his client, but also to the questions addressed by the Court to other witnesses. None of these other witnesses has objected to particular questions put by the Court. None has suggested that the Court by a course of questioning has prejudiced him. Nor has defendant Worcester objected. Therefore, it would seem that Callahan has no standing to object to the Court's course of questioning, whatever rights he may have to object to any question put to him as a witness involving him as an individual.

34. Even if Callahan had a standing to object, and even after a re-reading of the transcript, the questions which I put do not seem objectionable to me. Of course, I realize I am not the best judge of my own conduct. Also, of course, I am not unmindful of my own self-indulgent and impatient habits in putting questions. But, inasmuch as I cannot avoid passing upon the issue of my own conduct, after exercising every effort to look without favor or fear at my own failings, I have concluded that the motions are not sound in their claim that the proceedings have been, in whole or in part, infected by my interrogations.

35. Having so concluded, I may properly acknowledge that I recognize that one of the evils of interrogations by a judge is that he may invite himself (as I have invited myself in this case) into a position where he inevitably has to pass judgment on his own conduct. This by itself is an excellent reason for a judge not to put avoidable questions.

36. Yet there are some questions which a judge can and should put. Where a witness does not understand a lawyer, or a lawyer does not understand a witness, or time is being lost through a failure to come to the point, or a witness is evasive, a judge may properly use such powers as he has of intellectual clarification, dramatic condensation, and moral authority. Also the judge, after the lawyers have finished examining a witness, may inquire as to matters left cloudy or uncovered. Glanville Williams, The Proof of Guilt, (2nd ed., 1953) pp. 24–28.

37. But at all times the judge should be aware of the great power he has.

"O, it is excellent

"To have a giant's strength; but it is tyrannous

"To use it like a giant."

38. A judge's questions ought not to be sarcastic or rude. They ought so to be phrased as not to intimidate a witness who probably is already ill at ease on the stand. They ought never to be such as to drive a witness into an admission which reflects not the witness's refreshed recollection, but rather his fear of not falling in with the judge's wish.

39. No one who reads the record in this case—least of all myself—will find that on every occasion I have observed

my own canons of conduct. There are regrettable lapses, I acknowledge. And I have no wish to disjoin "remorse from power". But looked at as a whole, my questions seem to me to have helped, not harmed, the legitimate objects of the present proceeding.

### D

*The Propriety of the Court's Exercise of Discretion to Exercise Its Powers first to make disclosure of Worcester's confederates a condition of his probation, and second to conduct extensive hearings to determine whether Worcester had violated the conditions of his probation.*

40. Up to this juncture this opinion has reviewed questions as to what are its *powers* with respect to imposing conditions on a probationer, holding open hearings, and summoning and questioning witnesses. It might be said that if I am right that the powers do exist as a matter of law, and that there have been no such abuses as to constitute reversible error, my opinion ought not to go farther. Generally, judges do well to follow the Greek proverb to "sow with the hand and not with the whole sack" R. W. Livingstone, Literature, The Greek Legacy, (Ox., 1922) p. 265. But there are strong reasons in this case not to terminate my opinion at this point.

41. First, I ought not to pretend that the issues which underlie this case are purely technical. This Court can see what all the rest of the world can see. The proceedings in their combination of technical devices and in the range of inquiry represent not an invention nor innovation, but a composite, possessing a total significance different from a mere addition of the separate details. The whole is more than the sum of all its parts. It is important, as a matter both of jurisprudence and of public policy, to face up to the totality.

42. One of the perennial difficulties of American public law has been that so many major constitutional, administrative, and penal questions have been looked at as though the sole question to be considered is what is permissible. Does the text of the Constitution permit? Does the statutory law allow? Do the precedents support? Has the positive law erected any barrier? Those have become the staple line of inquiry. And the unwillingness avowedly to examine larger issues of history, philosophy, social policy, and wisdom debilitate our jurisprudence.

43. A major consequence of the abstention of judges from consideration of broad issues has been to make it appear to the layman that what is constitutional is wise. Again and again in debate, before and after judicial decision, in legislative hall, in country store, and in domestic parlors, there has been a tendency to argue that what a court upholds as law is on that account just and wise. Sometimes the permissible is not the preferable.

44. The strong and sound principle which has *rightly* precluded a court from *invalidating* because of its lack of wisdom legislation, or executive or administrative action, and the more dubious practice which has prevailed in courts which refrain from commenting on the expediency and fairness of legislative or executive or administrative action, certainly do not imply as a corollary that a court may not consider whether *judicial* action, permissible under the Constitution, statutes, and cases, is nonetheless unwise. And in considering the wisdom, or imprudence, or even folly, of action, there is hardly any branch of learning or common sense to which one may not turn for guidance.

45. A second reason not to stop with the purely technical question whether the present proceedings meet the *minimum* standards of the Constitution, the statute-book, and the case law is that we are here dealing with not a mere case or series of cases, but with the methods and materials of the criminal law, a topic always of major public interest. Montesquieu in his Spirit of The Laws, Bk. XII c. 2 wrote that "The knowledge * * * concerning the surest rules to be observed in criminal judgments is

more interesting to mankind than any other thing in the world." While one may be startled that a Frenchman establishes such a hierarchy of values, and while one may discount the pardonable emphasis and exaggeration of an author who founded the whole topic of comparative jurisprudence, it is undeniable that there is now, and perhaps at all times there is, widespread interest in what are the fairest and best ways to inquire into public wrongdoing (or, to be more accurate, malfeasance in office), to establish standards for righteous public conduct, and, in accordance with due process, expose and punish those who have failed in their duties of honor and integrity.

46. Bearing in mind the reasons for a broader opinion, I shall now consider whether it was wise to impose upon Worcester a sentence suspended on the condition that he should testify as to his fellow wrongdoers.

47. It is, of course, quite usual for a prosecutor to suggest to one of many wrongdoers that if he will turn state's evidence the prosecutor will recommend to the court that the informing defendant shall receive a lighter sentence. But it perhaps is not so usual for a judge to make it a condition of suspending a sentence and placing a defendant on probation that the defendant shall disclose the activities of his fellow wrongdoers.

48. I have already pointed out in part A of this opinion that imposition of such a condition is within a Court's power. Now I am considering only the question whether to have made such a condition was wise.

49. One favorable factor is that the imposition of such a condition in suspended sentence and probation orders was probably foreseen when the probation statute was passed. The statute was enacted March 4, 1925, [43 Stat. 1259; 18 U.S.C. § 3653]. It followed the decision of the Supreme Court of the United States in Ex parte United States, 1916, 242 U.S. 27, 37 S.Ct. 72, 61 L.Ed. 129, holding that without statutory authority a federal judge could not suspend a sentence and place a defendant on probation. When that case was argued in the Supreme Court, Richard W. Hale, Esq., and Frank W. Grinnell, Esq., as *amici curiae*, presented to the court a brief showing that the placing of a defendant on probation derived some of its historical support from the ancient practice of approvement, wherein a defendant was not given the expected punishment if he furnished the evidence upon which others could be and were convicted. See F. W. Grinnell, The Common Law Origin of Probation, XLV Mass.L.Qu. 70, 87.

50. But the difficulty in Mr. Grinnell's and my reference to the ancient procedure of approvement is that the reference tends to distract lawyers and others interested in the present proceedings from both (a) the precise technical basis upon which this revocation of probation rests (see part A of this opinion) and (b) the larger issues of present day policy (see part D of the opinion, of which, of course, this paragraph is a subdivision). Even Callahan's own counsel in his motions seems to have become distracted or confused on this point. For he argues as though the case at bar involved an approvement. It does not. The references to approvement were merely by way of analogy or historical antecedent.

51. Leaving historical curiosities aside, we should focus on exactly what is Worcester's situation. He is a convicted person called upon, in a revocation of probation proceeding, to give under oath, before a grand jury or like body, testimony with respect to his associates in a conspiracy involving wilful evasion of federal taxes, (§ 145(a) of the 1939 Internal Revenue Code, now part of 26 U.S. C. § 7203,) the federal offense of misprision of felony, (18 U.S.C. § 4), the federal offense of perjury, (18 U.S.C. § 1621), the federal offense of making false statements to federal agencies, (18 U.S. C. § 1001), and, incidentally, certain offenses under state law, such as bribery of state officials. (Mass.G.L., c. 268, §§ 7 and 8).

564

52. Worcester is *not* a person who came forward voluntarily to inform, or, as the slang phrase has it, to peach on a fellow culprit. Hughes, Tom Brown at Oxford, XII (quoted in VII O.E.D. 585); E. M. Forster, Two Cheers For Democracy, pp. 68, 69; E. Barker, Alexander to Constantine, 250, 321; C. Bailey, The Greek Atomists and Epicurus, p. 516; A. N. Whitehead, Adventures of Ideas, end of ch. V, p. 69; George H. Moore, Judaism, II, 181–188; S. Rapaport, Tales and Maxims From The Talmud, (London 1910), p. 99; R. H. Rovere, Senator Joe McCarthy, (Meridian, 1960), pp. 26, 158, 159, 216, 217.

53. Worcester is *not* a person who came forward voluntarily either out of zeal or spite, patriotism or malice. Palfrey, Compendious History of New England, vol. III, pp. 103–104, 108, 109, 111, 116; Plutarch, Lives, (Clough ed., Boston, 1895) Life of Brutus, vol. V, p. 340; Klausner, Jesus of Nazareth, (N.Y.1928), Bk. 6, ch. III, p. 325; D. Donald, Charles Sumner, pp. 264–265; Deuteronomy XIII, 2–12; The Meaning Of The Glorious Koran, (M. M. Pickhall ed., Mentor, 1953), p. 369, par. 12; Creon in Sophocles, Antigone, lines 181–182; Shakespeare, Othello; E. M. Forster, Two Cheers For Democracy, pp. 68–69; F. H. Bradley, Is There Such A Thing As Pure Malevolence, Essays, vol. I, p. 133; Coleridge, Essays And Lectures on Shakespeare, (Everyman, London, 1907) p. 172; Whittaker Chambers, Witness; John Strachey, The Strangled Cry, Encounter Magazine, Nov. 1960, pp. 3, 13–15.

54. Worcester is *not* a person who came forward voluntarily to disclose a secret he held in a professional capacity. C. K. Allen, R. v. Dean, CCXXV The Law Qu.Rev. 87, Jan. 1941. Cf. Mason, Brandeis, pp. 274–276; Jessup, Elihu Root, I, 158–159; Pringle, W. H. Taft, I 470–514; Stimson & Bundy, On Active Service, 29.

55. Worcester is *not* a person who came forward voluntarily in response to the promise of a financial reward consequent upon another's conviction. J. J.

Strachan-Davidson, Problems Of The Roman Criminal Law, (Ox.1912) vol. I, pp. 39–45, vol. II, pp. 1, 2, 6–50, and 136–140; Coke, Inst. 194; Beccaria, An Essay on Crimes and Punishments (2nd ed., London, 1769) ch. XXXVI and Voltaire's commentary thereon, pp. 1–liii; Montesquieu, The Spirit of The Laws, Bk. XII c. XVI; Allen, The Queen's Peace, pp. 90–92; F. W. Maitland, Justice and The Police, p. 18; 4 Blackstone, Commentaries *132; Radzinowicz, A History of Criminal Law, vol. I (1948), pp. 682–684; vol. II (1956) p. 35, note 6; Macaulay, History of England, vol. I c. 3; J. L. & B. Hammond, Poverty, Crime, and Philanthropy, Johnson's England, vol. I, pp. 300–335, 313, 328; Jonathan Wild's Case (1719), East 2 P.C. 746, s. c. (1725), 1 Leach 17, (1725) East 2 P.C. 770; Goebel, Colonial Law Enforcement in N. Y., p. 382. 18 U.S.C. § 3059; 19 U.S.C.A. § 1619; 31 U.S.C. §§ 231, 232, 234, 322; United States ex rel. Marcus v. Hess, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443; Cummings & McFarland, Federal Justice pp. 197–199, 201, 208; Note, 69 Harv.L.Rev. 1106, 1107 note 8; E. Freund, Standards of American Legislation, p. 253; L. O. Flaherty; The Informer.

56. Worcester is *not* a person who came forward voluntarily in response to a statutory or other offer to let him go unpunished if another was convicted on the basis of Worcester's testimony. Bracton's Notebook, Case 1159 Bracton, 523; Hale P. C., II 226–235; 4 Bl.Com. c. 25, *330; 2 Stephen, The Criminal Law, 250; Sir C. K. Allen, The Queen's Peace, 88–90; 2 Pollock & Maitland, A Hist. of Eng. Law, (2nd ed.) 631; 3 Holdsworth, A Hist. of Eng. Law, 608–609; Helen Maud Cam, The Hundred and The Hundred Rolls, (referring to the 26th article of inquiry in the Ragman's Rolls of 1274), pp. 70, 179; Rex v. Rudd, (1775), 1 Cowp. 331, 98 Eng.Rep. 1114; The Whiskey Cases, 99 U.S. 594, 599, 602–605, 25 L.Ed. 399.

57. Worcester is *not* a person who came forward in response to a duty laid upon him as a grand juror or other per-

son, such as a member of a certain order, or a local unpaid temporary constable, or a member of the local unpaid watch to discover criminals. George Lee Haskins, Law and Authority in Early Mass. p. 213 n. 116 (referring to Mass. Laws and Liberties of 1648 at 47).

58. Worcester is *not* a person who came forward in response to a duty laid on his community or special group to report offenders in their number or in their area. Maitland, The Criminal Liability of The Hundred in Collected Legal Essays, vol. I, pp. 230, 232, 239; Pollock & Maitland, History of English Law (2d. ed.), vol. I, p. 142; Vinogradoff, English Society in The Eleventh Century, pp. 6, 10–11, 216; Vinogradoff, Villainage, p. 357, note 1; Helen Maud Cam, The Hundred and The Hundred Rolls, pp. 18–19, 30–32; Sir C. K. Allen, Queen's Peace, pp. 70, 75–79; F. M. Stenton, Anglo-Saxon England, (2nd ed., 1947), pp. 503, 643; A. L. Poole, From Domesday Book to Magna Carta, pp. 58–59; T. F. T. Plucknett, Edward I and Criminal Law, p. 89; Note, 8 U. of Chic.L.Rev., pp. 338–343. See Lummus, J., in Com. v. Lopes, 318 Mass. 453, 456, 61 N.E.2d 849, note 2.

59. Worcester is *not* a person upon whom there is laid a statutory duty to keep a record of his own or another's conduct. Shapiro v. U. S., 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787.

60. Worcester is *not* an officer or employee of a government, or otherwise employed in an official or secret undertaking affecting the physical security of a government and who, as a result of such activities, has a special duty to discover or report wrongdoers. U. S. Atomic Energy Commission, In The Matter of Robert Oppenheimer, paragraph 5 of the charge; Charles P. Curtis, The Oppenheimer Case, pp. 58, 113, 134, 246; La Fayette Curry Baker, Dictionary of Am.Biog., vol. I, p. 522; Herman Melville, Billy Budd, Bedside Book of Am. Stories, at p. 172; Matthiesen, American Renaissance, p. 509.

61. Worcester is *not* a person who in these proceedings is being asked to fulfill a statutory duty to disclose his *mere observation* of an act of another engaged in violation of federal law. He aided every wrongdoer about whom he is being asked. That is, this case does not present for adjudication the issue whether mere knowledge of wrong can be a basis of misprision of felony, the offense now defined in 18 U.S.C. § 4.

62. Were any such issue raised many questions would be presented. Was there, indeed, any crime at common law if all that the defendant did was to observe another's wrong without actively concealing it, or hindering the law enforcement officers? An affirmative answer has been given by State v. Hann, 1878, 40 N.J.L. 228; Hale P. C. c. 59 § 2; 4 Bl.Com. *120, 121. And certainly an affirmative answer is implicit in the charge of Mr. Justice Benjamin Robbins Curtis given in this circuit, in U. S. v. Morris, Fed.Cas.No.15, 815, a case arising under the Fugitive Slave Act, G. W. Curtis, The Life and Writings of B. R. Curtis, vol. II, p. 172. See B. R. Curtis, Circuit Reports (1851) vol. I, p. 23; Channing, History, vol. VI, pp. 104–112; 3 A. J. Beveridge, Lincoln, p. 135.

63. But a negative answer would appear to be sounder. 2 Stephen, History of The Criminal Law, p. 238, 8 Univ. of Chic.L.Rev. 340, 341; 54 Harv.L.Rev. 506; 32 Va.L.Rev. 170; Wharton, Cr. Law, § 289; Am.L.Inst., Model Penal Code, Tentative Draft No. 9, p. 209; Marbury v. Brooke, 7 Wheat. 556, 575, 5 L.Ed. 522; U. S. v. Brandenberg, 3 Cir., 144 F.2d 656, 154 A.L.R. 1160; U. S. v. Perlstein, 3 Cir., 126 F.2d 789, 798; Neal v. U. S., 8 Cir., 102 F.2d 643; Bratton v. U. S., 10 Cir., 73 F.2d 795; U. S. v. Thornton, D.C.E.D.N.Y., 178 F.Supp. 42; U. S. v. Farrar, D.C.Mass., 38 F.2d 515, Id., 281 U.S. 624, 50 S.Ct. 425, 68 A.L.R. 892; Lummus, J., in Com. v. Lopes, 318 Mass. 453, 61 N.E.2d 849; People v. Lefkowitz, 294 Mich. 263, 293 N.W. 642; Holdsworth, Hist. of Eng. Law, vol. 8, pp. 322–324; Glanville Williams, Criminal Law, The General Part, (London 1953) § 69; Rex v. Alberg, [1948] 2 K.B. 173, 1 All Eng.Rep. 601;

Williams v. Bailey, (1866) L.R. 1 H.L. 200, 220. Most of the cases customarily cited to show that there was at common law such a crime as misprision of felony involve interference with officers of the law. This is true of every early English case cited by Mr. Justice Lummus in Com. v. Lopes, 318 Mass. 453, 61 N.E.2d 849. Or the early cases involve aid to a felon or active concealment of him. See Lady Lisle's case described in Campbell, Lives of The Chancellors, vol. 3, pp. 543–545, and Stephen, History of The Criminal Law, vol. I, p. 413, vol. II, p. 234. See Deborah Churchill's case, Newgate Calendar, (Navarre Society, London, 1926) vol. II, pp. 206, 208.

■ 64. Even if the mere failure to disclose, without active concealment, were an offense at common law, is it an offense under 18 U.S.C. § 4? The federal cases just cited hold it is *not.* Their conclusion is supported by statutory history. The original misprision statute, being part of the Crimes Act of April 30, 1790, 1st Cong., 2nd Sess., c. 9, § 6, 1 Stat. at Large, pp. 112, 113 related to concealment of a felony "upon the high seas, or within any * * * place * * * under the sole and exclusive jurisdiction of the United States." Perhaps half-unconsciously, the second session of the Sixtieth Congress, when it, by the Act of Mar. 4, 1909, c. 321, § 146, 35 Stat. at Large, pp. 1088, 1114, codified the criminal code, stretched the statute to reach one who conceals a felony "cognizable by the courts of the United States." Whatever may have been the Eighteenth Century meaning of "conceal", (See O.E.D. vol. II, p. 754), in the Twentieth Century, the Sixtieth Congress, as a matter both of literary style and of sound policy, must have intended merely to reach an active concealment.

65. To suppose that Congress reached every failure to disclose a known federal crime, in this day of myriad federal tax statutes and regulatory laws, would impose a vast and unmeasurable obligation. It would do violence to the unspoken principle of the criminal law that "as far as possible privacy should be respected."

There is "a strong reluctance on the part of judges and legislators to sanction invasions of privacy in the detection of crime." There is "a general sentiment that the right to privacy is something to be put in balance against the enforcement of the law." Sir Patrick Devlin, The Enforcement of Morals, p. 19. Cf. Z. Chafee, The Blessings of Liberty, ch. VIII, The Right Not To Speak, pp. 180, 182. This is a sentiment which, in cases of conscience, was cherished by the Massachusetts Puritans who drafted the Laws and Liberties of 1648. See George Lee Haskins, Law And Authority In Early Massachusetts, p. 213.

66. We should not be unmindful that some of the greatest moralists in our tradition have thought that they had no obligation to report every wrong they observed or could have observed. Farquharson, The Meditations of Marcus Aurelius, vol. I, pp. 39, 167, 168, 354; H. D. Thoreau, Civil Disobedience, The Writings of Thoreau, (The Modern Library, 1937) pp. 645, 659; E. M. Forster, Two Cheers For Democracy, pp. 68–69; Charles Morgan, The Silkworm and The Loom, or The Liberty to Mind One's Own Business, Liberties Of The Mind, (London 1951), pp. 226–229, 231. Dr. Samuel Johnson remarked that "No man is obliged to do as much as he can do; a man is to have part of his life to himself." quoted in the N. Y. Times, Jan. 10, 1956, p. 30. John Selden, that incomparable Seventeenth Century paragon of legal learning and wisdom, characteristically, put the principle in the form of a fable. "Wise men say nothing in dangerous times. The Lion you know called the Sheep to ask her if his Breath smelt; she said Aye; he bit off her head for a Fool. He called the Wolf and asked him; he said No; he tore him in pieces for a Flatterer. At last he called the Fox and asked him: truly he had got a Cold and could not smell." Selden, Table Talk (Pollock ed.) pp. 139, 140.

67. But we need spend no more time on misprision of felony, which is by no means the center of Worcester's problem. Nor is his problem like that of the various

classes of people heretofore excluded from consideration,—peachers, copper's narks, odious informers, tattle-tales, hunters for rewards, snoopers, busy-bodies, volunteers, vigilantes, and what Coke in his Institutes *194 called "viperous vermin".

68. Worcester is a witness under oath. His moral like his legal position is that of any witness.

69. For too long to make it worthwhile to investigate, and in too many cases to make it worthwhile to recite, the law has limited the matters as to which a witness may claim a privilege not to testify. And it is too plain to argue that a witness has no legal right to refuse relevant information merely because in furnishing it he will betray a friend, or inform against a confidant. Uphaus v. Wyman, 360 U.S. 72, 80, 79 S.Ct. 1040, 3 L.Ed.2d 1090; Wigmore, Evidence, 3rd ed., § 2286. But see to the contrary the 1648 Massachusetts Laws and Liberties, G. L. Haskins, Law and Authority In Early Massachusetts, p. 213.

70. It may be that an honorable man will conclude under some circumstances that, despite his legal obligation to testify about a friend, his conscience requires him to disobey the law and take the penal consequences. This often-commendable Thoreau-like activity of a citizen involves questions which are unnecessary for consideration by a judge in his official capacity, except where he is required to measure an appropriate sentence. "The clear duty of the judge * * * [is] * * * to enforce the established law." Ernest Barker, Principles of Social and Political Theory, p. 222.

71. And perhaps, despite what unreflecting people too readily assume, it may likewise be the duty of the conscientious citizen, save in the most grievous offense to his conscience, also to obey a law he regards as unjust. To be sure, we praise Antigone for her defiance of positive law in the name of a higher law. See Bowra, Sophocles, 65, 79, 98. But Antigone was not a typical Greek in her retort to the tyrant Creon:

"Nor did I think your edicts were so strong

"That any mortal men should override

"The Gods' unwritten and undying laws."

Sophocles, Antigone, lines 453–455.

72. The prevailing ancient view was that a good citizen obeyed an unjust law. So Plato described Socrates's attitude in The Crito. And one of the greatest contemporary scholars asking "what Pericles, Protagoras, and Socrates believed about the laws" answered "that they hold a city together, and that if they are broken, the individual is ruined no less than the city" Bowra Sophocles, 68, 79, 85. See Fasnacht, Acton's Political Philosophy, p. 91; Acton, History of Freedom, p. 71; Vinogradoff, Collected Papers, vol. II, p. 42. But see Franz Neumann, The Democratic and The Authoritarian State, ch. 5 "On The Limits of Justifiable Disobedience"; Acton, History of Freedom, Review of May's Democracy In Europe, p. 73.

73. Even the highest religious authority is by no means always to be cited for a conscientious defiance of the positive law. Lord Acton, Liberty, p. 29 believed that "when Christ said: Render unto Caesar the things that are Caesar's and unto God the things that are God's, those words, spoken on His last visit to the Temple, three days before His death, gave to the civil power, under the protection of conscience, a sacredness it had never enjoyed, and bounds it had never acknowledged; and they were the repudiation of absolutism and the inauguration of freedom." Compare A. N. Whitehead, Adventures of Ideas, end of ch. V, p. 69; E. Barker, Principles of Social and Political Theory, p. 277.

74. And, in a more secular philosophical vein, an outstanding moralist of the Twentieth Century, G. E. Moore, in Principia Ethica (1903) ch. V, § 99, p. 162 wrote that "In some cases the neglect of an established rule will probably be the best course of action possible." Yet

"with regard to any rule which is *generally* accepted, we may assert that it ought *always* to be observed, not on the ground that in every particular case it will be useful, but on the ground that in any particular case the probability of its being so is greater than that of our being likely to decide rightly that we have before us an instance of its disutility * * * Even if we can clearly discern that our case is one where to break the rule is advantageous, yet, so far as our example has any effect at all in encouraging similar action, it will certainly tend to encourage breaches of the rule which are not advantageous." Moreover, "the effect of an exceptional right action will be to encourage wrong ones" by both the doer and others. Compare T. H. Huxley's view that human society can only survive if, despite the golden rule, law is put in motion against the law breakers. T. H. Huxley and Julian Huxley, Touchstone For Ethics, 59.

75. While the immediately preceding paragraphs may seem an ostentatious parade of academic learning, they reach to the core of the dilemma faced by Worcester, and thus faced by a court that orders him to testify against his former associates. It cannot but give pause to any sensitive man to be required to report the misconduct of others, especially if he knows them, even if they are not his formal partners, his social friends, or his blood relatives. A court should move slowly to impose such a requirement. It ought to remember that it may offend a man's conscience in just the way the consciences of Socrates, Antigone, Thoreau, and many lesser men have been offended.

75. Having considered this very, very serious issue of conscience, I concluded that to require a convict on probation to testify about his fellow wrongdoers was justified here because of the nature of the crime, its magnitude, and the difficulty of other means of discovery. It is clear that such principles of compulsory disclosure lay back of the Congressional immunity statutes which in effect force witnesses to disclose subversive activities and participation in the drug trade. See The Immunity Act of 1954, 18 U.S.C. § 3486 (c), upheld in Ullmann v. United States, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511, and the immunity provisions of the Narcotic Control Act of 1956, 18 U.S.C. § 1406 upheld December 19, 1960 in Reina v. United States, 81 S.Ct. 260. There is hardly any question that such principles may fairly be applied by a federal court to require disclosure of associates in a federal crime of bribery of federal public officials. Lord Chancellor Macclesfield's Trial, (1725) 16 How.St.Tr. 921, 1147; Cobbett's Parliamentary History, vol. XII, pp. 625–754, Hansard Parl.Deb., 1st Ser., VI, 401; Cong.Globe, Jan. 23, 1857, p. 434; Wigmore, Evidence, 3rd ed., § 2281; Maxwell Branden, Reflections on Ullmann v. U. S., 57 Col.L.Rev. 500; John Strachey, The Strangled Cry, Encounter Magazine, Nov. 1960, pp. 3, 13–15.

77. But, to be entirely straightforward, what is doubtful is whether on strict moral grounds as well as on political grounds it is justifiable for a federal court to require disclosure of associates in what in one aspect is a federal crime of tax evasion and perjury before federal internal revenue agents, but in another aspect is the purely local crime of bribery. Later in this opinion something is said of the risks of intrusion by the federal government into the sphere of local police power. And if this objection had been pressed by Worcester at the outset, I am not quite sure I would not have been pulled up short by a persuasive argument. But the point was not raised. And I do not feel any moral compunctions in having indirectly forced him to testify about other people violating state criminal laws as well as federal criminal laws. My reason is that on the evidence so far heard I strongly suspect that if any bribes were paid to state officials they were in two respects treated in violation of federal tax laws. Tax deductions were unlawfully taken by the briber. And, at least sometimes, taxable receipts of bribes were unlawfully omitted from tax returns of the bribed official.

78. While I have no difficulty in concluding that the probationer, Worcester,

has in no way been offended by my proceedings, and indeed he makes no complaint of any discretionary or other errors of this Court, there is a different problem with respect to the witnesses, particularly the prospective witness Callahan, who have complained. Not merely they resent the exposure of their private affairs to a glare of publicity, (which, though they may not believe it, no one, literally no one, entirely enjoys). More importantly, some of them see special perils in this proceeding to which they believe they ought not to be exposed.

79. They regard it as fundamentally unfair to put them under oath as witnesses to testify to matters occurring many years ago, many of which are barred, by the statute of limitations, from direct prosecution. No doubt, they are aware, (for I have reminded them,) that if a person, in this proceeding, on any material matter, gives testimony, wilfully contrary to his oath, which he does not believe to be true, he is guilty of perjury under 18 U.S.C. § 1621.

80. But I hope no witness has construed my warning as an indication that I designed the present revocation proceeding as a trap to lure men into a perjury prosecution. In my statement of facts I declared, and I repeat, that when I sentenced Worcester, when I received the United States Attorney's complaint, and at every other stage of this case I had the *bona fide* purpose of requiring Worcester to disclose the crimes of others, not to reach by the indirect means of a perjury prosecution toward the crimes of others. Indeed it did not occur to me until a few days ago when I read 8 Wigmore, Evidence, 3rd ed., § 2279, and Mr. Justice Brennan's opinion in In re Pillo, 11 N.J. 8, 93 A.2d 176, that these others could not easily avoid the risk of perjury by claiming a privilege under the Fifth Amendment.

81. In my warnings to witnesses in this revocation proceeding I have reminded them that a person may be subjected to a perjury prosecution for a deliberate falsehood about an outlawed crime. U. S. v. Hiss, 1950, 2 Cir., 185 F.2d 822, certiorari denied, 340 U.S. 948, 71 S.Ct. 532, 95 L.Ed. 683. Cf. C. K. Allen, R. v. Dean, CCXXV Law Qu.Rev. (Jan. 1941) 87, 98, 100–102.

82. And I have reminded witnesses that the perjury statute can be applied to a false statement under oath which a witness corrects after he has been contradicted by another witness. United States v. Norris, 1937, 300 U.S. 564, 57 S.Ct. 535, 81 L.Ed. 808.

83. These extreme applications of the perjury statute, as well as the risks of federal prosecution for perjury added to a state prosecution for local crime, are a constant threat. And, as the transcript shows, (particularly, while there were on the stand Mrs. Norton, her son, and Mr. Philip Murphy), I have sought to caution them of the risks they ran. For I did not want them to feel, as the solicitor Nasmith felt about the hanging of John Reid for sheep-stealing "the littleness of human justice, that could not reach a man for the crimes he committed, but punished him for what he did not commit." Womsatt & Pottle, Boswell For The Defense, 1769–1774, p. 349, Sept. 21, 1774.

84. Moreover, I have not forgotten that a federal perjury prosecution may be based upon a wilfully false statement about a matter not punishable by the federal criminal law. And this indirect extension of federal criminal jurisprudence raises the most perplexing public questions as to whether the national government is not unwisely entering into the domain of state matters, thus undermining the federal character of our constitution and polity, and presenting the risk of a totalitarian society. See Robert H. Jackson, The Supreme Court In the American System, The Godkin Lectures, (Harvard University, Cambridge, 1955), pp. 70–71; Henry M. Christman, The Mind and Spirit of John Peter Altgeld, (University of Illinois, 1960), pp. 160–161. The national government's increasing invasion of the local area of police power is, admittedly, one of the not universally applauded characteristics of our age.

85. Such invasions have often been beneficent. Without national intervention, under the guise of the war, tax, or commerce powers, it is arguable that the Negro slaves would not have been freed, kidnapping would not have been virtually eliminated, the drug traffic would not have been controlled, the rackets plaguing metropolitan areas would not have been punished, monopolistic aggregations of capital and labor would not have been combatted, interstate thefts would have evaded prosecution, and high standards of detection and investigation would not have been developed by the F.B.I. as a pattern for local emulation.

86. Yet such national interventions have commonly rested upon specific Congressional enactments. Even such acts have not always received from commentators as full consideration on a policy basis as they may seem to merit. Cf. T. R. Powell, Vagaries and Varieties In Constitutional Interpretation, N.Y., 1956, 3rd lecture, pp. 49–87, Bowie and Friedrich, Studies In Federalism; Columbia University, Bicentennial Celebration, Federalism.

87. For a single judge, without direct legislative command, conducting a mere revocation proceeding, to go more broadly than the absolute necessities of the probation revocation proceeding requires, into local conduct raises issues of magnitude. The procedure I have followed appears to many to involve more than an aggregation of "molecular changes in the structure of society." Vinogradoff, Villainage In England, (Ox. 1892), p. 43. It touches upon the sensitive nerve of local pride. It may impair, not strengthen, the forces of self-government and self-correction in a community. It may not be duly regardful of the wisdom of that early Pilgrim, John Robinson, "We are with one another, not over one another." [Quoted by R. Pound in his contribution to Federalism As A Democratic Process (Rutgers University 1942), p. 10.]

88. Investigation wider than the imperative necessities of a revocation proceeding cannot be excused on the plea that ventilation of wrongdoing is itself a restraint on wrongdoers and hence a public good. See Watkins v. United States, 354 U.S. 178, 187, 77 S.Ct. 1173, 1 L.Ed.2d 1273; Barenblatt v. U. S., 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115; Uphaus v. Wyman, 360 U.S. 72, 82, 79 S.Ct. 1040, 3 L.Ed.2d 1090.

89. A federal judge is not, ex officio, authorized to implement the views expressed by Henry L. Stimson, when he served as United States District Attorney, that "there is a great need * * * for the punishment of publicity * * *. A thorough ventilation of the administration of the Customs House [a federal, not a state agency, it must be expressly noted] would greatly assist the efforts of those officials who are trying now to reform it. It is difficult for a stranger to have any notion of the way in which this system of graft has entered into the conception of all the subordinates of this service, or of how they have stood together in the defense of it * * * men whose moral sense had been blunted must be made to understand how these actions looked to the people; the hand of the hard-pressed reformer must be upheld by informed opinion." Stimson and Bundy, On Active Service, pp. 13–14.

90. It is the bar and not the bench which must give the lead if we are to lay the ground-work for local or national statutes requiring open competitive bidding for public contracts for services as well as goods. (Cf. 41 U.S.C.A. § 5), for elimination of secret or open conflicts of interest, (Cf. Assoc. of Bar of City of N. Y., Special Committee on the Federal Conflict of Interest Laws, Cambridge, 1960), for public records of amounts paid private agents to keep in contact with public officials, and for recovery of amounts extorted or wheedled from those who do business with the government.

91. Reliance must be placed on the energy, action, and sense of dedication of a citizenry imbued with the faith that a democracy thrives only when each feels that, inconvenient and financially unre-

warding as it may be, his public service is a personal obligation. The spirit needed is that of George W. Curtis, of whom, in Poems, IV, 144, James Russell Lowell wrote:

"I loved my Country so as only they

"Who love a mother fit to die for may;

"I loved her old renown, her stainless fame,—

"What better proof than that I loathed her shame."

Compare Ralph Barton Perry, Puritanism and Democracy, p. 28; Louis F. Post, Ethics of Democracy, (1903).

92. What is needed is what in his speech on Robert Gould Shaw, at the ceremonies dedicating a memorial, still standing, before the State House, on Boston Common, [Memories and Studies, at pp. 57–58,] William James called a "lonely kind of courage",—That kind of valor as James knew, is rare. " * * * of five hundred of us who could storm a battery side by side with others, perhaps not one would be found ready to risk his wordly fortunes all alone in resisting an enthroned abuse. The deadliest enemies of nations are not their foreign foes; they always dwell within their borders. And from these internal enemies civilization is always in need of being saved. The nation blest above all nations is she in whom the civic genius of the people does the saving day by day, by acts without external picturesqueness; by speaking, writing, voting reasonably; by smiting corruption swiftly; by good temper between parties; by the people knowing true men when they see them, and preferring them as leaders to rabid partisans or empty quacks."

93. Similar ideas were expressed in Ralph Waldo Emerson's essay on Politics, Emerson Essays, First Series, (Boston, 1903), p. 217: "In our barbarous society the influence of character is in its infancy. As a political power, as the rightful lord who is to tumble all rulers from their chairs, its presence is hardly yet suspected." John Jay Chapman, in the Selected Writings, edited by Jacques Barzun, p. 30, wrote that "We can see also the inner relation between morality and constitutional law, which exists in all ages * * * No day passes in which man is not put to the test many times over, as to his personal relation towards the cowardices and cruelties of his age."

94. A judge is to decide, not to awaken, controversy. Others must create the drama which will arouse adolescent and adult from apathy. Twentieth Century Magazine, Nov. 1960, pp. 395, 396, 446, 447. But surely the record in this case furnishes occasion to quote Daniel Webster's argument in a quite different case: "a community that would not be roused to action upon an occasion such as this was, a community which should not deny sleep to their eyes, till they had exhausted all the means of discovery and detection, must indeed be lost to all moral sense, and would scarcely deserve protection from the laws." Webster's Great Speeches, (ed. Edwin P. Whipple, Boston, 1882), p. 197.

95. Complicated as are the tasks of creating in a modern industrialized society the sense of personal political responsibility, (see R. Pound, Criminal Justice in America, 1930 edition, pp. 60–61; Sir Oliver Franks, Central Planning, pp. 27 and 34; Santayana, Dominations and Powers, chs. 28–31, particularly p. 408), no challenge presented to the free democracies by the Communist world is greater than the relative capacities of the two competing systems to enlist day-to-day individual participation in the details of local government, the acknowledged root of every viable society.

96. Taking as a background the considerations just canvassed, which militate against federal intervention in local matters and against judicial activism in political matters which are essentially dependent on civic courage, I have no intention of allowing the moving party, Callahan, to be broadly examined on his feasance or malfeasance, his obedience to or violation of state laws.

97. It is my purpose, unless Callahan otherwise requests for his self-protection in the forum of public opinion, to limit his examination to the points which led to his being summoned and other points which are related to Worcester's trial, sentence, and possible revocation of probation.

98. Presumably the interrogation will concentrate on the question whether Callahan received directly or indirectly payments from Worcester or Thomas Worcester Co. Inc. which they took as federal tax deductions and which he failed to report as federally taxable income. Other questions, such as whether Callahan in his testimony at Worcester's federal criminal trial in August and September 1960 did commit perjury in violation of federal law, whether Callahan conspired with others than Worcester to interfere with a truthful presentation of evidence in that criminal trial, whether from sources other than Worcester Callahan received but did not report federally taxable income, presumably cannot be inquired into because they do not have a sufficiently direct relation to the only issue to be decided by this Court. That single issue is whether Worcester fulfilled the conditions of his probation by giving candid testimony.

Motions denied.

### Opinion of Jan. 5, 1961.

1. This Court has all the evidence necessary and proper to enable it to decide whether Worcester has violated the conditions of his probation. And this Court is entirely clear, on grounds to be recited, that Worcester is not *now* in violation of his probation, and the complaint, filed by the District Attorney, seeking revocation of probation, should be, and hereby is, dismissed, without prejudice to the right of the District Attorney, at any future time, upon new evidence, or upon failure of Worcester hereafter to cooperate with the authorities denominated in the probation order, to file a new complaint.

2. Worcester's testimony before the Grand Jury and later in the office of the United States District Attorney falls into three main parts. First, he identified former members of the state legislature, a former candidate for the Republican nomination as Governor, and a present member of Congress as recipients of what may, with some euphemism, be called The Worcester Bounty. Second, he stated that he gave to Mrs. Norton, at her home, while Callahan was there, cash, which Mrs. Norton put in Callahan's pocket in his coat hanging in the hallway. Third, Worcester denied that he had any other knowledge of consequence as to who were the ultimate recipients of the remaining parts of the roughly $275,000 paid to Norton, or any of the rest of The Worcester Bounty.

3. The first of the foregoing three parts of Worcester's testimony was adequately confirmed by the testimony of the recipients of The Worcester Bounty.

4. The second of the foregoing three parts was the crux of the not always pin-pointed testimony which covered many weeks. I found Worcester's testimony before me candid, credible, complete. To be sure, he was not quite clear where Callahan's coat was hanging. It may be that he did not observe Mrs. Norton actually slip a packet of bills into Callahan's pocket. But in this hearing, which is, after all, not a criminal case against Callahan, that is, which is not a proceeding in which every essential element of a crime must be established beyond a reasonable doubt, I am fully satisfied with the correctness of Worcester's version. Cf. Holland v. U. S., 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150; Becher v. U. S., 2 Cir., 5 F.2d 45 (per L. Hand C. J.); Com. v. Webster, 5 Cush.Mass. 295, 320 (per Shaw, C. J.); C. P. Curtis, The Oppenheimer Case, p. 228; The Earl Jowitt, The Strange Case of Alger Hiss, p. 332.

5. Nor is there any reason for me to prefer the version of Mrs. Norton. She is a witness whose testimony reveals constant instances of direct falsehoods and inexplicable failures to remember. It is beyond belief, for example, that she did not see, and indeed use, any cash in the

safe deposit boxes she leased jointly first with her husband, and then with her daughter. Her plainly concocted story about visits to the box to look at insurance policies and wills would not persuade any intelligent person. Her account of why she procured a larger box defies credence.

6. Equally clearly, there is no reason for me to prefer Callahan's version to Worcester's. It is true, of course, that Worcester might conceivably seek to gain his own freedom by implicating an innocent man. But Worcester does not appear to me to be a Jonathan Wild, or a seeker after Naboth's Vineyard. He is, a most reluctant source of infamous information about others. Sitting, as he has, month after month in this court room, during first a jury trial and later a revocation of probation proceeding, he has completely persuaded me of his decency.

7. Callahan's flat denial of the claimed incident at Mrs. Norton's home is unconvincing. Callahan from the outset has shown a want of candor about his relations with the late Francis Norton and members of his family. No one who reads in full Callahan's testimony first before the petit jury and then in these revocation proceedings would care to stake much on Callahan's oath. The petit jury was hardly given the same impression that the revocation hearings give of Callahan's familiar relations with, and interest in, Norton, his wife, and his son. I unhesitatingly stamp Callahan as an untrustworthy witness. And I accept Worcester's story of the episode at Mrs. Norton's home.

8. As to the third part of Worcester's testimony before the Grand Jury and before U. S. District Attorney Richardson, I also believe Worcester. The tendency of an otherwise decent man, like Worcester, when he gets into a sordid racket of extortion, bribery, and corruption is, as much as possible, to look the other way, as his hand stretches forth to disburse a Bounty. Except for the episode in Mrs. Norton's home, Worcester did not know in that kind of detail, with that kind of accuracy of ob-servation, required of a witness before he can effectively testify. He did not want that kind of knowledge. He never had it. He cannot legitimately invent it. And even if, with a battery of detectives and investigators, he had tried to discover the facts he would have had as much difficulty as the District Attorney has had in this case.

9. Worcester being entitled to continue on probation, is there anything more this Court should say? In my view, the bench and the bar are entitled to a somewhat broader opinion, trying broadly to assess the value, if any, and the fruits, if any, of the revocation proceeding, now brought to an end.

10. It is legitimate and desirable to bring out in public such matters as do affect a Court's determination whether to revoke probation. High policy and severe consequences are involved. Correct determination is more likely if the Court is subject to contemporaneous observation. In Re Oliver, 333 U.S. 257, 270, 68 S.Ct. 499, 92 L.Ed. 682; Cowley v. Pulsifer, 137 Mass. 392, 394 (per Holmes J.).

11. The inquiry into Worcester yielded as by-products a deeper public interest in, and concern about, many topics which are worth listing.

(a) Under the present system does the Bureau of Internal Revenue follow sound procedures to trace the payment, and receipt, *in cash,* of large sums often falsely claimed as deductible items from gross taxable income, or falsely omitted from accountable gross taxable income? Is it incumbent upon the legislative or executive branch of the government, by statutory change, by administrative ruling, by adoption of practices in the Federal Reserve System, or otherwise, to require *every* bank to report to some central authority *each* large withdrawal of cash in bills, together with such explanation (e. g. payroll purposes) as the withdrawer gives? Would this be an improper invasion of privacy, or is it in fact no more than often has been imposed on bankers and their clients in the interests of national security, or of preserving the sta-

bility of the banking system against foreign or other withdrawals? Is it more burdensome or intrusive to require such quasi-confidential disclosure by administrative means, than by the regular statutory reporting characteristic of wage, dividend, and other payments relevant to income tax matters? Or than by the open court processes upheld by Judge Learned Hand in McMann v. S. E. C., 2 Cir., 87 F.2d 377, 109 A.L.R. 1445. See also Bowles v. Shawano Nat. Bank, 7 Cir., 151 F.2d 749; Wigmore, Evidence, (3rd ed.) § 2286.

(b) Upon what basis was Worcester singled out for prosecution? Can it be true that of the successful bidders for contracts with the state Worcester *alone* paid bribes and took them as deductions from federal income tax? May it be that the report on Worcester came from a bank which was properly dismayed to find that Worcester was re-assigning to another an account theretofore assigned to it? Could it be that the bank knew no other contractors equally guilty of income tax evasion? Doesn't the landlord almost always know when the tenant runs a gambling casino? And once informed of Worcester's subjection to extortion, and Worcester's improper deductions of bribes, why did the Internal Revenue Service stop its scrutiny, if it did stop, before checking all reputable firms of engineers?

(c) What sort of responsibility have the press, and other media of communication, displayed in reporting this case? Can it truly be said that, with a high standard of detachment, they have told the public all the court evidence that was discreditable, no matter whose ox was gored? Did they report the testimony that in their own press contractors inserted advertisements which served no legitimate purpose of contractors but, so far as appears, could have had as their objects only the glorification of state officials of something less than perfect purity, and the increase of advertising revenues of media which might thereafter be friendly to such officials? Did they recite that Beal and his firm, Public Relations Inc.,

both allegedly engaged in public relations, or in "putting out fires if fires occurred", (an eventuality which seems never to have occurred,) apparently received money not only from Worcester but from a public utility? Was the press aware that a news report of that extraordinary expenditure by a company having its own normal public relations staff and its own regular advertising agencies might force the Department of Public Utilities to slough off its indifference, and start an inquiry about some friends and patrons of the press? On the whole, except for a commendable uncovering of the details of how many state legislators are currently serving as agents for fidelity, bonding, and other insurance companies, how much has the press thought of itself as the protector of civic integrity? How has the press earned the high praise of Mr. Justice Robert H. Jackson who said that, even more than the courts, they could be the guardians of liberty, the sentinels who watch for the capricious and the corrupt, the arbitrary and the autocratic? See The Supreme Court In The American System, pp. 81, 82.

(d) How far has the bar initiated reform based upon its daily experience with the sufferings their clients have undergone at the hands of a network of corruption? Were sophisticated lawyers unaware until this case began, that to secure certain types of public business a contractor had to get his performance bond, or his materialman's bond, or his bond for wages, or his trustees' bond from a relative of a judge, or of a public official, or of a legislator? Has there been no way to expose this system, whereby the favored insurance agent receives cash for nothing more than a telephone call and a few details passed on to the fidelity or insurance company? Is the only method by which this venal system will be supplanted a public insurance system modeled on other governmental insurance systems? Have the private interests which professedly care about the capitalist system no awareness of what kind of free enterprise they have been foster-

ing? Do they not realize that the people will smite them when they see what this corruption costs in taxes, and, more important, in trustworthiness of judges, legislators, and executives?

12. But it will be said that the questions just put are no business of a judge. He is not to be a common scold. Nor is he to use his place to push before the public his name, his views, his personality. If he does so, will it not be believed that, not content to be a robin in his own back yard, he aims to be a Washington eagle screaming for carrion,—a vulture, without song or sweetness, seeking a national audience?

13. I am not unmindful that just such charges have been and will be made. And I am not unaware that no humble disclaimer of egoism and ambition will be acceptable in all quarters. There will be those who say that in no way does pride more clearly manifest itself than in a pretended humility. Confession of error may be one of the most conceited forms of self-aggrandizement.

14. But even if one is to be charged with vanity, with absence of taste, with lack of grace, with lust for higher office, is it not time to sound a clarion? Another will blow it better. But it is worth something to prove that the trumpet can be blown. And it is more important, far more important, to give to the Grand Jury, to the District Attorney, and to those vested with broad investigatory powers the sense of public support.

15. "To do justly, to love mercy, and to walk humbly with thy God" is a command which sometimes can be fulfilled only in a spirit of righteous indignation.

The hearings are terminated.

All witnesses are excused.

The probation of Worcester is continued.

### Opinion of Jan. 9, 1961.

This Court deems it appropriate to add the following brief summary for use in any other court where is drawn in question the propriety of the procedure and proceedings in this Court.

Lawyers and judges are familiar with the principle that when the District Attorney has ground to believe that a witness under oath before the Grand Jury wilfully fails to tell the whole truth in response to a material matter, the District Attorney may procure from the Grand Jury an indictment. Fifth Amendment to the United States Constitution; 18 U.S.C. § 1621. Alternatively, if the witness waives prosecution by indictment, the District Attorney may prosecute by information. Rules 7 (a) and 7(b) of the Federal Rules of Criminal Procedure, 18 U.S.C. Whether the procedure is by indictment or by information, Rule 23 permits the witness to waive a jury trial with the approval of the Court and the consent of the Government. Then sitting alone, the judge hears all the relevant evidence. Under the Sixth Amendment to the United States Constitution, this involves a public trial. To it a second witness may be summoned to testify as to all relevant material matter. Except where he validly and seasonably claims a recognized privilege that has not lapsed (see In Re Pillo, 11 N.J. 8, 93 A.2d 176; 8 Wigmore, Evidence, 3rd ed., § 2279), this duty is not affected by the fact that his testimony involves disgraceful or incriminating conduct. As in the Worcester case, the second witness in a prejury prosecution may be heard, against his will, in a proceeding initiated by the District Attorney without a formal indictment by a Grand Jury. But in a perjury prosecution, unlike in the Worcester revocation of probation proceedings, the second witness does not have the additional safeguards of having his own counsel examine, cross-examine, object, argue, and, if appropriate, summon additional witnesses and proffer additional testimony.

The bench and bar, through their familiarity with the traditional procedures

for perjury prosecutions, will recognize that the Worcester revocation of probation procedures involve no new point of substance, especially inasmuch as Worcester consented to the terms of his probation and, when revocation was at issue, sought to offer witnesses at a public hearing before a single judge.

What is a new fashion? That which reaches behind the average man's memory to use and adapt the successful styles and patterns of our past. As the Amherst critic, Brownell, put it, epigramatically, "Nothing seems so novel as a re-introduction of the stylish woman's hat of another generation."